NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 25-5375

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

AMERICAN OVERSIGHT,

*Plaintiff-Appellee*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

*Defendants-Appellees,*

COMMITTEE ON WAYS AND MEANS OF THE U.S. HOUSE OF
REPRESENTATIVES

*Defendant-Intervenor-Appellant*.

————————————

On Appeal from the U.S. District Court for the District of Columbia
(Hon. Emmet G. Sullivan, U.S. District Judge)

————————————

**DEFENDANT-INTERVENOR-APPELLANT'S BRIEF**

Matthew B. Berry
  *General Counsel*
Todd T. Tatelman
  *Deputy General Counsel*
Brooks M. Hanner
  *Associate General Counsel*
Kenneth C. Daines
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESNTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Defendant-Intervenor-Appellant*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Defendant-Intervenor-Appellant respectfully submits this certificate as to parties, rulings, and related cases.

**A. Parties and Amici**

Plaintiff-Appellee is American Oversight.

Defendants-Appellees are the United States Department of Health and Human Services and Office of Management and Budget.

Defendant-Intervenor-Appellant is the Committee on Ways and Means of the United States House of Representatives.

In the district court, there were no amici, and Defendant-Intervenor-Appellant was the only intervenor. There have been no amici or intervenors in this Court to date.

**B. Rulings Under Review**

Defendant-Intervenor-Appellant appeals from the following rulings of the district court (Hon. Emmet G. Sullivan): the September 24, 2025 Memorandum Opinion (ECF No. 114) and September 24, 2025 Order (ECF No. 115) denying Defendant-Intervenor-Appellant's motion for summary judgment and granting Plaintiff-Appellee's cross-motion for summary judgment, and the September 30, 2025 Order (ECF No. 117) entering final judgment in this action.

**C. Related Cases**

This case has previously come before this Court upon appeal by Plaintiff-

Appellee from an earlier ruling by the district court. *See Am. Oversight v. HHS*, 101 F.4th 909 (D.C. Cir. 2024) (docket number 22-5281). Defendant-Intervenor-Appellant is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY.........................................................................................x

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF THE ISSUE................................................................3

PERTINENT CONSTITUTIONAL PROVISIONS, RULES, AND STATUTES...4

STATEMENT OF THE CASE.................................................................4

SUMMARY OF THE ARGUMENT .....................................................10

STANDARD OF REVIEW ..................................................................12

ARGUMENT ....................................................................................12

   I.   UNDER FOIA, THE CONGRESSIONAL-RECORDS TEST DETERMINES CONTROL OF DOCUMENTS CREATED PURSUANT TO CONGRESS'S ARTICLE I POWER.......................................12

       A.  Congressional records are not subject to FOIA ......................12

       B.  The Congressional-records test asks whether there are objective indicia of Congress's manifest intent to control documents exchanged with a federal agency...........................................................14

       C.  The Congressional-records test reflects "special policy considerations" that apply when Congress exercises its Article I powers .......................20

  II.  BECAUSE THE COMMITTEE CLEARLY MANIFESTED ITS INTENT TO CONTROL THE LEGENDED DOCUMENTS, THE RECORDS ARE NOT SUBJECT TO FOIA...........................................................21

       A.  The Committee's legend manifested a clear intent to control the Legended Documents ...............................................................22

       B.  The Committee specifically identified and limited disclosure of the Legended Documents by affixing the legend to the documents themselves ...............................................................26

  C. The Committee's manifestation of intent was timely ............................28

  D. Deference is warranted because the Committee created and transmitted the Legended Documents in the exercise of its Article I authority .........29

III. THE DISTRICT COURT COMMITTED NUMEROUS ERRORS IN CONCLUDING THAT THE LEGENDED DOCUMENTS ARE AGENCY RECORDS ...................................................................................................31

  A. The district court erred by discounting the objective indicia of Congressional intent to control and instead conducting a subjective inquiry into Congressional decision-making .....................32

    1. The district court mistakenly inquired into whether the Committee was conducting a "formal oversight investigation," which is not relevant to the Congressional-records test .........................................................32

    2. The district court erred by second-guessing whether Committee staffers were properly authorized to affix the legend ......................................................................................34

    3. The district court wrongly concluded that the Committee's assertion of control lacked sufficient specificity ..................................................................................39

  B. The district court erred in concluding that the Agencies were free to use the documents "as they saw fit" because the Agencies never had exclusive control over them................................41

IV. BY ENABLING EXECUTIVE AND JUDICIAL SECOND-GUESSING OF INTERNAL CONGRESSIONAL AFFAIRS, THE DISTRICT COURT'S APPROACH IS INCONSISTENT WITH THE SEPARATION OF POWERS ..................................................................................................45

CONCLUSION.........................................................................................54

CERTIFICATE OF COMPLIANCE.....................................................56

CERTIFICATE OF SERVICE ..............................................................57

ADDENDUM ...............................................................................Add. 1

# TABLE OF AUTHORITIES[*]

**Cases**                                                          **Page(s)**

*Adair v. England*,
    183 F. Supp. 2d 31 (D.D.C. 2002) ...................................................54

*Allen v. Dep't of Def.*,
    580 F. Supp. 74 (D.D.C. 1983) .....................................................44

*\*Am. C.L. Union v. CIA (ACLU I)*,
    105 F. Supp. 3d 35 (D.D.C. 2015) ..................................16, 29, 41, 44

*\*Am. C.L. Union v. CIA (ACLU II)*,
    823 F.3d 655 (D.C. Cir. 2016) ....................1, 8, 10, 12, 14-19, 24-26, 33, 38, 42

*Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*,
    464 F. Supp. 3d 228 (D.D.C. 2020) ...............................................54

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*,
    83 F.3d 667 (D.C. Cir. 2016) ......................................................26

*Am. Oversight v. HHS*,
    101 F.4th 909 (D.C. Cir. 2024) ..................................4, 7, 9, 30, 52, 53

*Cause of Action v. Nat'l Archives & Recs. Admin.*,
    753 F.3d 210 (D.C. Cir. 2014) ..............................................13, 15, 19

*Cause of Action Inst. v. DOJ*,
    282 F. Supp. 3d 66 (D.D.C. 2017) .................................................27

*Cox v. DOJ*,
    504 F. Supp. 3d 119 (E.D.N.Y. 2020),
    *aff'd*, 111 F.4th 198 (2d Cir. 2024) .............................................48

*Cox v. DOJ*,
    No. 17-CV-3329, 2022 WL 21304584 (E.D.N.Y. Mar. 30, 2022),
    *aff'd*, 111 F.4th 198 (2d Cir. 2024) .............................................43

---

[*]  Authorities upon which we chiefly rely are marked with asterisks.

*Cox v. DOJ*,
   111 F.4th 198 (2d Cir. 2024) ............................................................42

*DOJ v. Tax Analysts*,
   492 U.S. 136 (1989)........................................................................14

*Goland v. CIA*,
   607 F.2d 339 (D.C. Cir. 1978) ...................................................................
   ................................................. 2, 15, 17, 19, 20, 23, 29, 32, 33, 38, 41, 45, 46, 48

*Gravel v. United States*,
   408 U.S. 606 (1972).......................................................................38

*Holy Spirit Ass'n for the Unification of World Christianity v. CIA*,
   636 F.2d 838 (D.C. Cir. 1980),
   *judgment vacated in part on other grounds*,
   455 U.S. 997 (1982)........................................ 17, 25, 28, 29, 33, 41

*Jewish War Veterans v. Gates*,
   506 F. Supp. 2d 30 (D.D.C. 2007) .............................................33, 34

*Jud. Watch, Inc. v. Dep't of Energy*,
   412 F.3d 125 (D.C. Cir. 2005) ......................................................48

*Jud. Watch, Inc. v. DOJ*,
   20 F.4th 49 (D.C. Cir. 2021) ........................................................12

*Jud. Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ................................ 10, 14, 15, 16, 31, 43, 44, 47

*Kissinger v. Reps. Comm. for Freedom of the Press*,
   445 U.S. 136 (1980).................................................................50, 51

*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) ....................................................48

*McSurely v. McClellan*,
   553 F.2d 1277 (D.C. Cir. 1976) (en banc) .....................................33

*Paisley v. CIA,
    712 F.2d 686 (D.C. Cir. 1983),
    *opinion vacated in part*,
    724 F.2d 201 (D.C. Cir. 1984) (per curiam) ........... 14, 15, 16, 20, 31, 33, 41, 50

*Quinn v. United States*,
    349 U.S. 155 (1955) ................................................................. 21, 33

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) ...................................................... 49, 51

*Trump v. Mazars USA, LLP*,
    591 U.S. 848 (2020) .................................................................... 21

*Unted States v. Ballin*,
    144 U.S. 1 (1892) ................................................................... 35, 47

*United We Stand Am. v. IRS*,
    359 F.3d 595 (D.C. Cir. 2004) ..........................................................
    ...... 8, 10, 12, 13, 16, 17, 18, 20, 23, 24, 25, 27, 28, 33, 38, 40, 41, 42, 44, 45, 46

*Watkins v. United States*,
    354 U.S. 178 (1967) ..................................................................... 33

## Constitution

U.S. Const. art. I, § 1 ....................................................................... 35, 46

*U.S. Const. art. I, § 5, cl. 2 ............................................................... 35, 46

U.S. Const. art. I, § 5, cl. 3 ............................................................... 35, 52

U.S. Const. art. I, § 6, cl. 1 ................................................................... 35

## Statutes

*5 U.S.C. § 551(1) ......................................................................... 12, 50

5 U.S.C. § 552 ................................................................................. 12

5 U.S.C. § 552(a)(3)(A) ....................................................................... 12

5 U.S.C. § 552(a)(4)(B) ..................................................................3, 12

5 U.S.C. § 552(f) ...............................................................................12

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

44 U.S.C. § 2118 ................................................................................50

**Legislative Authorities**

112 Cong. Rec. 13647 (1966) ...........................................................13

Comm. on Oversight and Gov't Reform, Authorization and Oversight
    Plans for all House Committees, H. Rep. No. 115-69 (2017) ...........37

Comm. on the Judiciary, Clarifying and Protecting the Right of the Public to
    Information, and for Other Purposes, S. Rep. No. 89-813 (1965) .....52

*Federal Public Records Law (Part 1): Hearings Before a Subcomm. of the*
    *H. Comm. on Gov't Operations*, 89th Cong. 65 (1965) ......................36

J. Comm. on the Org. of Cong., Organization of the Congress,
    H. Rep. No. 103-413, vol. 2 (1993) ...................................................51

Rule 22, Rules of the Committee on Ways and Means of the U.S. House of
    Representatives, 115th Cong. (2017) ..................................................37

Rules of the House of Representatives,
    115th Cong. (2017)

    House Rule X ......................................................................................36

    House Rule XI .....................................................................................36

Rules of the House of Representatives,
    119th Cong. (2025)

    House Rule X ......................................................................................36

    House Rule X.1(t) ..........................................................................36, 37

House Rule X.2(c) ........................................................................37

House Rule X.2(d)(1) ...................................................................37

House Rule XI...............................................................................36

*To Eliminate Congressional and Federal Double Standards: Hearing on*
*S. 1112 Before the Subcomm. on Oversight of Gov't Mgmt. of the S. Comm.*
*on Governmental Affs.*, 96th Cong. (1979)........................................51

**Other Sources**

Columbia Journalism School, FOIA @50 Conference Day 2,
YouTube (June 3, 2016) ................................................................13

## GLOSSARY

| | |
|---|---|
| CIA | Central Intelligence Agency |
| DOJ | U.S. Department of Justice |
| FOIA | Freedom of Information Act |
| HHS | U.S. Department of Health and Human Services |
| IRS | Internal Revenue Service |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |

# INTRODUCTION

This Court has established a clear test to determine when a legislative document exchanged between Congress and an Executive Branch agency is subject to the Freedom of Information Act (FOIA). That test asks simply whether Congress manifested its intent to control the document. *See, e.g.*, *Am. C.L. Union v. CIA*, 823 F.3d 655, 662-63 (D.C. Cir. 2016) (*ACLU II*). In reliance on this Court's precedents, the Committee on Ways and Means of the U.S. House of Representatives (Committee) affixed a legend clearly establishing its intent to control the documents at issue in this case (Legended Documents). Accordingly, those documents are Congressional records not subject to FOIA.

The Committee's intent to control the Legended Documents could not have been manifested more clearly. Indeed, the Committee precisely conformed to guidance from this Court by marking the documents with a clear legend stating that they remain subject to the Committee's control. The legend also indicates that the documents are not "agency records" subject to FOIA. Moreover, by placing the legend on the very documents the Committee wished to control, its manifestation of intent went beyond what the law required. *Cf. ACLU II*, 823 F.3d at 665, 667-68 (holding that manifestation of intent communicated five years earlier was sufficient to establish control).

While the magistrate judge in her report and recommendation appropriately credited the Committee's legend and concluded that the Legended Documents were Congressional records, the district court disagreed. In ruling that the Legended Documents were instead agency records, the court departed from this Court's precedent, inappropriately peering behind the legend's text to inquire whether the Committee's work was "formal" enough to merit protection and whether the Committee staff members who applied the legend were sufficiently senior. In doing so, the district court transformed this Court's straightforward objective test into a multipronged, subjective judicial examination of internal legislative procedures.

Beyond misapplying Circuit precedent, the district court's disregard of the legend is also a recipe for constitutional conflict. It invites the Executive and Judicial Branches to second-guess the House's internal rules and delegations of decision-making authority, matters that the Constitution leaves to the House itself. If adopted by this Court, this approach would threaten the very interests underlying the Congressional-records test: namely, Congress's authority to control its own documents and the danger of chilling its communications with the Executive Branch. *Goland v. CIA*, 607 F.2d 339, 348 n.48 (D.C. Cir. 1978). Effective and frank communication with agencies is essential to the legislative process—whether through a Congressional committee chairman or staff member, and whether in a

formal hearing or an informal email exchange—and it depends on a predictable rule of control. The district court's approach muddies the waters for all future Congressional entities that want to communicate with agencies without the risk of exposing those communications to FOIA requesters.

For these reasons, this Court should reject the district court's application of the Congressional-records test, hold that the Legended Documents are not agency records, and reverse the judgment below.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. That court entered its final judgment on September 30, 2025, JA889-90, and the Committee timely appealed on October 23, 2025, JA891-92. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in concluding that five sets of email communications exchanged between a Congressional committee and federal agencies—each of which contained a legend, affixed by Committee staff pursuant to the Committee's general authorization, instructing the agencies that these documents are Committee records, remain subject to Committee control, are entrusted to the agency only for use in handling the matter at hand, and are not

subject to FOIA—are nonetheless agency records subject to disclosure under FOIA rather than Congressional records excluded from FOIA.

## PERTINENT CONSTITUTIONAL PROVISIONS, RULES, AND STATUTES

The pertinent constitutional provisions, rules, and statutes are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

In early 2017, the House engaged in a significant effort to draft and pass health care reform legislation. *Am. Oversight v. HHS*, 101 F.4th 909, 912-13 (D.C. Cir. 2024). The Committee was at the forefront of this effort, which involved frequent communications with Executive Branch officials. As this endeavor was underway, Plaintiff-Appellee American Oversight submitted two identical FOIA requests to the U.S. Department of Health and Human Services (HHS) and Office of Management and Budget (OMB) (the Agencies) on March 15, 2017, seeking communications between the Agencies and Congress related to health care reform legislation. *See* JA021-53.

This litigation arises from those requests. Specifically, American Oversight sought, among other things, "[a]ll communications, meeting notices, meeting agendas, informational material, draft legislation, talking points, or other materials exchanged between HHS and any members of Congress or congressional staff

relating to health care reform" from January 20, 2017, to the date of the search. JA036.[1]

After reaching a stalemate with the Agencies regarding the requests, American Oversight filed suit on May 4, 2017, challenging the Agencies' failure to grant expedited processing, the adequacy of the searches, and the alleged withholding of non-exempt records. *See* JA028-32 ¶¶ 36-68. The district court ordered the Agencies to review and process responsive documents, and the Agencies eventually produced approximately 953 documents. JA852-53. The documents the Agencies produced in response included *redacted* versions of the Legended Documents. *See* JA054-55.

The Legended Documents constitute five email chains, one between staff of the Committee and OMB staff, and four between Committee staff and HHS staff. *See* JA751-815; JA816-18. Each email chain includes multiple email messages, and two of the email chains contain at least one attachment. *See id.*

The OMB document is an email chain between a Committee staff member and an OMB employee that was part of a broader conversation about health care reform legislation. *See* JA756-97. The last email message in the OMB email chain was sent by the Committee to OMB on April 4, 2017, and included the

---

[1] In its FOIA request to OMB, American Oversight separately made the same request for such records exchanged between "OMB and any members of Congress or congressional staff." JA044.

retransmission of conversations between the parties dating back to March 27, 2017.
*See* JA756. In the April 4 message, the Committee staff member attached three documents and included the following legend:

> This document and any related documents, notes, draft and final legislation, recommendations, reports, or other materials generated by the Members or staff of the Committee on Ways and Means are records of the Committee, remain subject to the Committee's control, and are entrusted to your agency only for use in handling this matter. Any such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communications, including but not limited to any replies to the Committee, are also records of the Committee and remain subject to the Committee's control. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act or other law.

*Id*. The legend was manually inserted by Committee staff, who were authorized by the Committee to include the legend when appropriate. *See* JA752 ¶ 10.

The HHS documents are four email chains, mostly containing the same set of email messages between an HHS employee and several Committee staff members. *See* JA798-15; JA816-18. In three email chains, an email from an HHS employee on April 1, 2017, is the most recent email sent in the chain. JA838 ¶¶ 7-8; JA845 ¶¶ 7-8. In two of those email chains, the HHS employee's April 1 email message responded directly to an email from a Committee staff member that included the manually inserted Committee legend. *See* JA798-815. In the third email chain, the HHS employee's April 1 email message was not a direct response to a message with the Committee legend, but the manually inserted Committee

legend is included earlier in the email chain.  *See* JA802-06.  An email message from a Committee staff member in the third email chain included an attachment.  *See* JA807-15.  The fourth email chain is substantially similar to these other email chains but contains one additional email message from an HHS employee to Committee staff members.  JA817 ¶ 2.[2]

On September 15, 2017, the Committee moved to intervene in this litigation to argue that the Legended Documents were Congressional records not subject to FOIA.  *See* JA009.  It did so both to prevent Plaintiff from compelling production of unredacted versions of these documents and to advance the House's institutional interest in the proper treatment of its documents.  The Agencies and the Committee filed separate motions for summary judgment, and American Oversight filed a cross-motion for summary judgment.  JA010-11.  The district court referred the case to a magistrate judge, JA012, who recommended granting the Committee's motion for summary judgment "as to the [L]egended [D]ocuments, which are congressional records not subject to FOIA," JA676.

---

[2]  The documents originally produced by HHS included only three email chains that contain the legend.  JA853.  However, when HHS reprocessed documents following this Court's ruling in *American Oversight v. HHS*, 101 F.4th 909 (D.C. Cir. 2024), it found this fourth email chain that contained the legend.  *See* JA816-18, 853.

As relevant here, the magistrate judge applied this Court's Congressional-records test. JA659-60. The magistrate judge surveyed this Court's precedent and found that the legend is "substantially similar to the instructions the D.C. Circuit Court held to be sufficient in establishing congressional intent" to control documents for FOIA purposes. JA661 (first citing *ACLU II*, 823 F.3d at 665; then citing *United We Stand Am. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004)). The magistrate judge noted that the Committee's specific instructions "are several sentences long, expressly asserting Congress's intent to retain control over the documents and explicitly restricting the production of the documents in response to a FOIA request," while also emphasizing that those instructions were particular to the documents themselves because they "appear on the documents." *See* JA664. According to the magistrate judge, the legend also manifested Congress's intent "that the [Agencies'] responses to the legended emails also be retained as congressional records." JA663. Accordingly, the magistrate judge concluded that the Legended Documents were Congressional records that were "not subject to disclosure under FOIA." JA652.

Notwithstanding the magistrate judge's recommendation on the Congressional records issue, the district court granted the Agencies' motion for summary judgment on other grounds—that the documents were protected by FOIA Exemption 5—and thus found the Committee's motion moot. JA748.

American Oversight appealed the district court's decision.  JA750.  This Court then held that the "consultant corollary" to FOIA Exemption 5 does not apply to the documents at issue because "the record show[ed] Congress had an independent stake in [potential health care reform legislation] and did not provide disinterested advice as an agency employee would."  *Am. Oversight*, 101 F.4th at 912.  This Court remanded and directed the district court to grant American Oversight's motion for summary judgment "insofar as the communications between the agencies and Congress are not covered by Exemption 5."  *Id.* at 925.

On remand, the Committee renewed its motion for summary judgment (which American Oversight and the Agencies opposed), again contending that the Legended Documents are Congressional records.  American Oversight cross-moved for summary judgment, arguing that the documents are subject to FOIA.  The district court ultimately disagreed with the magistrate judge's earlier recommendation and held that the Legended Documents are "agency records" subject to FOIA.  The district court concluded that "the actions here – staffers simply copying and pasting a catch-all disclaimer into any communication they find appropriate" – did not constitute a clear assertion of Congressional intent to control the Legended Documents.  JA886-87.  It relied on the lack of evidence that the records were produced pursuant to "any specific oversight investigation or other function," JA872-75, the lack of facts showing the relevant staffers' scope of

9

authorization to use the legend to assert control on behalf of the Committee, JA875-79, and its conclusion that the legend was too "generic and far-reaching" to show that Congress clearly manifested an intent to control the Legended Documents, JA879-81. The district court also found that the Agencies' use of the documents for their own internal decision-making about the proposed health care reform legislation and for making a recommendation to the President demonstrated that they "used the documents as they saw fit," favoring a conclusion that these were agency records. JA882-86.

## SUMMARY OF THE ARGUMENT

Under this Court's longstanding precedent, whether a document created by Congress pursuant to its Article I authority and shared with the Executive Branch is a "Congressional record" or an "agency record" for purposes of FOIA "turns on whether Congress manifested a clear intent to control the document." *ACLU II*, 823 F.3d at 662-63; *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221 (D.C. Cir. 2013); *United We Stand*, 359 F.3d at 597. Once a Congressional entity clearly manifests its intent to control such records, this Circuit treats them as Congressional records not subject to disclosure under FOIA, and the inquiry ends there. This deferential test respects Congress's decision to exclude itself from FOIA while protecting its confidential records and its need for robust oversight of and candid dialogue with the Executive Branch.

Here, the Committee's staff manually affixed a legend to legislative communications expressly indicating that the documents (1) are records of the Committee, (2) remain subject to the Committee's control, (3) are entrusted to the agency only for use in handling the matter then being discussed, and (4) are not "agency records" for purposes of FOIA. JA751-52 ¶¶ 3, 10. Because the Committee manifested its intent to control the Legended Documents in unmistakably clear terms—indeed, it is difficult to imagine how it could have been clearer—they are not agency records subject to FOIA. And because the Committee exchanged these communications to aid its consideration of health care reform legislation, the Congressional-records test requires deference be given to the Committee's stated intention to retain control of them.

The district court erred in disagreeing with the magistrate judge and reaching the contrary conclusion, eschewing this Circuit's easily administrable bright-line rule in favor of subjective inquiries into whether a "formal" oversight investigation was taking place, whether a staffer was too junior to speak on behalf of the Committee, and whether the staffer's assertion of control was too routine. It also erred by interpreting the Committee's choice to afford the Agencies discretion to use the documents for handling health care reform discussions as surrendering exclusive control over them. This Court should reject the district court's approach, which is not only inconsistent with this Court's precedent but would also require

Executive and Judicial Branch micromanagement of legislative decision-making that would undermine the separation of powers.

## STANDARD OF REVIEW

In FOIA cases, this Court reviews a district court's decision to grant summary judgment de novo.  *See Jud. Watch, Inc. v. DOJ*, 20 F.4th 49, 54 (D.C. Cir. 2021).

## ARGUMENT

### I. UNDER FOIA, THE CONGRESSIONAL-RECORDS TEST DETERMINES CONTROL OF DOCUMENTS CREATED PURSUANT TO CONGRESS'S ARTICLE I POWER

#### A. Congressional records are not subject to FOIA

Congress enacted FOIA to provide a federal statutory right of public access to certain Executive Branch information.  *See* 5 U.S.C. § 552.  FOIA thus requires federal agencies to make certain agency records available to the public upon request, *id.* § 552(a)(3)(A), while granting federal district courts jurisdiction "to order the production of any *agency records* improperly withheld from the complainant," *id.* § 552(a)(4)(B) (emphasis added).  Because FOIA expressly limits this access to "agency records," *ACLU II*, 823 F.3d at 661-62, and Congress is not an agency, "congressional documents are not subject to FOIA's disclosure requirement," *United We Stand*, 359 F.3d at 597 (citing 5 U.S.C. §§ 551(1), 552(f)); *see also ACLU II*, 823 F.3d at 662 ("[I]t is undisputed that Congress is not an agency.").

In other words, FOIA was designed as an Executive Branch transparency statute; Congress did not intend the statute to reach Legislative or Judicial Branch records. *See, e.g.*, 112 Cong. Rec. 13647 (1966) (statement of Rep. Ogden Reid) ("[A]ny person will now have the right of access to records of *Federal Executive and regulatory agencies*." (emphasis added)).[3]  Interpreting the meaning of "agency records" to include documents belonging to Congress would create an uncontemplated backdoor for the public to obtain Legislative Branch deliberations and documents shared with federal agencies despite Congress's intent that FOIA not open such records for public inspection. *See Cause of Action v. Nat'l Archives & Recs. Admin.*, 753 F.3d 210, 216 (D.C. Cir. 2014) ("FOIA does not define 'agency records,' but we are confident that Congress did not intend to expose legislative branch material to FOIA simply because the material has been deposited with the Archives.").

---

[3]  Later statements describing FOIA's legislative intent accord with this history. *See, e.g.*,  Columbia Journalism School, *FOIA @50 Conference Day 2*, YouTube at 3:48:30 (June 3, 2016), https://www.youtube.com/watch?app=desktop&v=71D6z2YQzIM (statement of Benny Kass, Counsel, Foreign Operations and Government Information Subcommittee) ("What happened on the floor: John Moss called me and said 'Benny can you come and sit … on the floor' because he wanted me to answer questions … .  The bill was introduced and John made a presentation … and … we must have had twenty to twenty-five members of Congress come up to John Moss and say: 'John it's great, but does this apply to us?'  And John … pontifically stood up and said: 'Absolutely not.  The … Constitution separates Congress from the Executive and therefore it does not apply to us.'  'Fine, we'll vote for it.'").

**B.     The Congressional-records test asks whether there are objective indicia of Congress's manifest intent to control documents exchanged with a federal agency**

As a threshold matter, not all documents in an agency's possession are "agency records" under FOIA. *Jud. Watch*, 726 F.3d at 216.  To qualify as "agency records," an agency must both (1) "create or obtain" the records *and* (2) "control [the records] … at the time the FOIA request is made."  *DOJ v. Tax Analysts*, 492 U.S. 136, 144-45 (1989).  Accordingly, the mere fact that an agency possesses records transmitted to it by another entity is not sufficient to make them subject to FOIA.  Rather, the agency must establish that it *exclusively controlled* the transmitted records at the time it received the relevant FOIA request.  *See Paisley v. CIA*, 712 F.2d 686, 693 (D.C. Cir. 1983), *opinion vacated in part*, 724 F.2d 201 (D.C. Cir. 1984) (per curiam).

While this Court typically looks to four factors to determine whether an agency has demonstrated sufficient control over records,[4] the four-factor test "does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United

---

[4]  Those factors are: (1) "the intent of the document's creator to retain or relinquish control over the records"; (2) "the ability of the agency to use and dispose of the record as it sees fit"; (3) "the extent to which agency personnel have read or relied upon the document"; and (4) "the degree to which the document was integrated into the agency's record system or files."  *See ACLU II*, 823 F.3d at 662 (citation omitted).

States Congress." *ACLU II*, 823 F.3d at 662 (quoting *Jud. Watch*, 726 F.3d at 221). This is because "special policy considerations … counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents." *Id.* (ellipsis in original) (quoting *Paisley*, 712 F.2d at 693 n.30). These special policy considerations apply whenever Congress exercises Article I authority (formally or informally), regardless of whether the documents are for "legislative" or "oversight" purposes. *See infra* Section I.C.

In such cases, this Court applies a truncated test to determine whether the document is an "agency record" subject to disclosure under FOIA. Under this Congressional-records test, when an agency possesses such a document obtained from Congress or prepared in response to a communication from Congress, the judicial inquiry is simply "whether Congress manifested a clear intent to control the document." *ACLU II*, 823 F.3d at 662-63 (citation omitted).

This Court has consistently indicated that when a document "bears clear indicia of a congressional purpose to ensure secrecy," that "indicia of Congress'[s] continuing [c]ontrol … [is] *dispositive* of a document's 'congressional' status," *Goland*, 607 F.2d at 348 n.48 (emphasis added), and the view of an agency possessing the Congressional document does not change the analysis, *see, e.g.*, *Cause of Action*, 753 F.3d at 215 ("In this line of cases, we have analyzed *only* the

transferring entity's intent to control the documents and their future use."
(emphasis added)).

Agencies, by contrast, carry a heavier burden to establish control of these documents for FOIA purposes: to qualify as agency records, "the agency to whom the FOIA request is directed must have *exclusive* control of the disputed documents." *Paisley*, 712 F.2d at 693 (emphasis added). It therefore follows that when "Congress has manifested its own intent to retain control, then the agency— by definition—cannot lawfully 'control' the documents … and hence they are not 'agency records,'" meaning there is no further dispute. *Id.* (footnote omitted); *ACLU II*, 823 F.3d at 664 (same); *Jud. Watch*, 726 F.3d at 222 (same); *United We Stand*, 359 F.3d at 600 (same); *Am. C.L. Union v. CIA*, 105 F. Supp. 3d 35, 45 (D.D.C. 2015) (*ACLU I*) (same). Thus, the two factors courts consider under this truncated test—whether the document's creator intended to retain control and whether the agency has exclusive control over it—effectively merge into one when Congress clearly manifests its intent to control a document. *See ACLU I*, 105 F. Supp. 3d at 45.[5]

---

[5] While in some circumstances the second factor of the test could independently come into play for determining control, such as where Congress's manifestation of intent to control was not objectively clear on its face, once Congress clearly manifests its intent to control a document, an agency cannot establish "exclusive control" without Congressional acquiescence. *See infra* Section III.B.

Significantly, the Congressional-records test does not require "Congress to act in a particular way in order to preserve its FOIA exemption for transferred documents." *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 842 (D.C. Cir. 1980), *judgment vacated in part on other grounds*, 455 U.S. 997 (1982). Indeed, control can be shown through a variety of means and circumstances, provided that the manifestation of intent is clear.

For instance, no magic words are necessary for intent to be clearly shown—even a single word may suffice. In *Goland*, the seminal case establishing the Congressional-records test, a transcript of a confidential Congressional hearing that was in the CIA's possession for *thirty years* was still held not to be an agency record subject to FOIA because at the time it was received by the agency, "the [t]ranscript bore the typewritten marking 'Secret' on its interior cover page," a marking that "appear[ed] to have been appended at the time the [t]ranscript was made." 607 F.2d at 347. Based primarily on the inclusion of this single word on the transcript, this Court concluded that it was "not an 'agency record' but a congressional document" because "on all the facts of the case Congress' intent to retain control of the document [was] clear." *Id.* at 348.

Nor is the Congressional-records test limited to records produced or provided by the Congressional entities themselves. *See ACLU II*, 823 F.3d at 662 (noting Congress may manifest its intent to control documents that an agency has

"prepared in response" to a Congressional request).  For instance, in *United We Stand*, this Court held that portions of a document created *by the IRS* were not an agency record subject to FOIA because Congress had manifested its intent to control that information.  359 F.3d at 605.  There, the requester sought "a document the [IRS] created in response to" a letter from the Joint Committee on Taxation with a legend stating that "[t]his document is a Congressional record and is entrusted to the [IRS] for your use only" and "may not be disclosed without the prior approval of the Joint Committee."  *Id.* at 597.  This Court held that the Joint Committee had manifested its intent to control not only its letter request but also "the portions of the [IRS] response that would reveal that request"—even though the Joint Committee's legend did not explicitly mention *any* IRS response.  *Id.* at 605.  In other words, the legend's manifestation of intent to control the information itself was sufficiently clear to extend to future documents containing that information, and thus to remove those documents from FOIA's reach.

Furthermore, as this Court clarified in *ACLU II*, neither a legend on the document nor even a contemporaneous manifestation of intent to control is necessary.  *ACLU II* involved a Senate Select Committee report held not to be subject to FOIA even though it contained *no* legend or confidentiality stamp and had been transmitted with a letter stating that it "should be made available within … the Executive Branch for use as broadly as appropriate."  823 F.3d at 667.

Despite this language, this Court held that the Select Committee retained control because at the start of its investigation it had sent a letter to the CIA with "expansive language" stating that "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee," and that "[t]hese documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee." *Id.* at 665, 667-68 (emphasis omitted). Though far-reaching in scope, this earlier language clearly manifested the Select Committee's intent to retain control of the later report, so the report was held to be "a congressional document" not subject to FOIA. *Id.* at 667. In short, once a Congressional entity manifests its intent to control its documents,[6] that intent is dispositive: the documents are Congressional records not subject to FOIA.

---

[6] Agency custody of Congressional documents is distinct from legal control over them. When a committee, or any Congressional entity, shares information with an agency for technical assistance or input on legislation, as happened here, the agency acts only as a "trustee" or custodian of those records. *See Goland*, 607 F.2d at 347 (CIA was acting as a "trustee" for Congress in holding a Congressional transcript). Just as lawyers do not "own" clients' documents entrusted to their possession, or mechanics do not take ownership of cars brought into their shop for repairs without consent, the Agencies likewise do not "own" the legislative work product shared by a Congressional entity for a specific purpose and with specific restrictions. *See Cause of Action*, 753 F.3d at 216 (stating that the fact that Congressional documents were "deposited with the [agency]" does not "expose legislative branch material to FOIA").

### C. The Congressional-records test reflects "special policy considerations" that apply when Congress exercises its Article I powers

The Congressional-records test provides an important shield against outside interference with Congress's Article I powers and prerogatives. Specifically, this Court has explained that the test is justified by "(1) Congress' clear intent to exempt congressional documents from disclosure under FOIA; (2) Congress' clear prerogative to prevent disclosure of its own confidential materials; and (3) the danger of inhibiting the legislative … branch[] from making their records available to the executive branch." *Goland*, 607 F.2d at 348 n.48. Ultimately, the test seeks to protect Congress's ability to legislate and investigate in furtherance of that aim without having its confidential materials exposed to the public view.

Indeed, this Court's "explicit focus on Congress' intent to control (and *not on the agency's*) reflects those special policy considerations which counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents," thereby "safeguard[ing] Congress' long-recognized prerogative to maintain the confidentiality of its own records as well as its vital function as overseer of the Executive Branch." *Paisley*, 712 F.2d at 693 n.30 (emphasis added); *see also United We Stand*, 359 F.3d at 599 (explaining that these "policy considerations unique to the congressional context" include "Congress's right to keep its own materials confidential").

These "special policy considerations" are present whenever Congressional entities exercise Article I authority, including when they communicate with agencies in furtherance of legislating and conducting oversight. *Cf. Quinn v. United States*, 349 U.S. 155, 160 (1955) ("There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation."); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (Congress's "power 'to secure needed information' in order to legislate … encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" (citations omitted)). For purposes of the Congressional-records test, there is no meaningful or relevant distinction between Congress's legislative and oversight powers. *See infra* Section III.A.1. Moreover, these special policy considerations do not depend on the existence of a formal oversight investigation, *see id.*, or specific documentation demonstrating that Committee staff have been delegated authority to perform certain functions.

## II. BECAUSE THE COMMITTEE CLEARLY MANIFESTED ITS INTENT TO CONTROL THE LEGENDED DOCUMENTS, THE RECORDS ARE NOT SUBJECT TO FOIA

The Legended Documents are Congressional records because the Committee manifested its clear intent to control them. Indeed, it did so in the most

straightforward way possible, by including a legend in its communications with the Agencies explicitly stating that: (1) these communications with the Agencies and the Agencies' responses remain subject to the Committee's control; (2) the Committee is entrusting them to the agency only for use in handling the matter at hand; and (3) they are not subject to FOIA.

The legend adhered closely to the direction provided by this Court's precedents. In fact, the Committee exceeded what the case law requires by including the legend in the communications themselves, manifesting its unmistakable intent to control *these documents* in particular. And the Committee did so well before Plaintiff submitted its FOIA requests, making that manifestation timely. Accordingly, the district court erred in holding that the Legended Documents are "agency records" subject to FOIA.

### A. The Committee's legend manifested a clear intent to control the Legended Documents

The Committee clearly manifested its intent to control the Legended Documents. Specifically, each of the five Legended Documents at issue in this case includes a detailed legend that was affixed by a then-Committee staff member. The legend states in relevant part: "This document … [is a] record[] of the Committee, remain[s] subject to the Committee's control, and [is] entrusted to your agency only for use in handling this matter." JA751-52 ¶ 3. The legend also states that "[a]ny such documents created or compiled by an agency in connection with

22

any response to this Committee document or any related Committee communications, *including but not limited to any replies to the Committee*, are also records of the Committee and remain subject to the Committee's control." *Id.* (emphasis added). While these clear statements alone would have been sufficient to establish control (for purposes of FOIA) over the Committee's emails here and the Agencies' responses, the legend puts an even finer point on it by adding that "the aforementioned documents are not 'agency records' for purposes of the Freedom of Information Act." *Id.*[7]

Under this Court's precedents, confidentiality directives like this are the gold standard for establishing that documents are Congressional records. By specifically indicating that the records belong to the Committee rather than the agency, the Committee's legend leaves no room for uncertainty; this clear manifestation more than provides "sufficient indicia of congressional intent to control," *United We Stand*, 359 F.3d at 600, making it "dispositive" under this Court's governing test, *see Goland*, 607 F.2d at 348 n.48.

---

[7] Though these clear manifestations need no further support, the Committee's General Counsel separately affirmed that the "Legended Documents are the Committee's confidential Congressional records" and that if they are produced, "the Committee's interests in maintaining control over its confidential Congressional records would be irreparably impaired." JA753 ¶¶ 12-13.

Indeed, as the magistrate judge concluded, the Committee's legend adheres closely to this Court's precedents; it is "in relevant part, substantially similar to the instructions the D.C. Circuit … held to be sufficient in establishing congressional intent in *ACLU v. CIA* and *United We Stand*." JA661; *see also ACLU II*, 823 F.3d at 665 (holding that the following instruction manifested the Select Committee's intent to control: "[a]ny … reports or other materials generated by Committee staff or Members[] are the property of the Committee …. These documents remain congressional records in their entirety …."); *United We Stand*, 359 F.3d at 597 (same for this instruction: "[t]his document is a Congressional record and is entrusted to the [IRS] for your use only. This document may not be disclosed without the prior approval of the Joint Committee." (citation omitted)).

These similarities are not coincidental: The legend was crafted in direct reliance on these precedents to ensure that Congress established control over the documents in a legally effective manner. The magistrate judge noted this very point when she observed that, based on the Committee's participation in the *United We Stand* litigation, "it seems likely" that the language at issue here "is a direct result of the court's decision in [*United We Stand*]. This lends support to the claim that Congress intended to retain control over such documents." *See* JA661 n.4.

In fact, the Committee here followed precisely the guidance set forth in *United We Stand*. In that case, this Court explained that "[i]f the Joint Committee

[on Taxation] intended to keep confidential not just 'this document' but also the [agency] response, it could have done so by referring to 'this document and *all* [agency] documents created in response to it'" in its legend. *United We Stand*, 359 F.3d at 601 (emphasis added)). So here the Committee's legend asserts control over both (1) the document to which it is affixed ("this document") *and* (2) "[a]ny such documents created or compiled by an agency in connection with any response," including "any replies to the Committee." JA751-52 ¶ 3. The Committee's inclusion of the legend is thus sufficient to manifest its intent to control both the Committee's emails and each agency's responses.

Furthermore, the Committee's manifestation of intent here was even stronger than in *ACLU II* because the Legended Documents themselves bear the legend, in contrast with the Select Committee's report there that contained no legend and was transmitted to the Executive Branch *five years* after the Select Committee had provided its "expansive language" indicating its intent to control. *ACLU II*, 823 F.3d at 665, 667-68.

The fact that the top email in at least three of the HHS email chains was sent by an HHS employee rather than Committee staff, *see* JA798-815, changes nothing. This Court has already "recognized the possibility that agency-created documents could in fact become congressional records." *United We Stand*, 359 F.3d at 599 (citing *Holy Spirit*, 636 F.2d at 842-43). And Circuit precedent clearly

establishes that Congress, as the Committee did here, may manifest its intent to control not only documents that an agency has obtained from Congress but also documents that an agency has "prepared in response to a request from" Congress. *See ACLU II*, 823 F.3d at 662.

### B. The Committee specifically identified and limited disclosure of the Legended Documents by affixing the legend to the documents themselves

The Committee left no ambiguity over whether it was manifesting an intent to control the Legended Documents. As the magistrate judge observed, "[t]he legends are particular to the documents themselves because they are affixed to the documents." *See* JA663. The circumstances here bear no resemblance to the "non-specific assertion" of control described by the district court. JA871.

To be sure, not every individual email message and attachment within the Legended Documents includes the legend. But that is irrelevant to the Congressional-record analysis. Consistent with the reality that email chains are stored and accessed as unified records, the Agencies processed each email chain entirely as a single record when producing them pursuant to FOIA. *See* JA075; JA198-99. This means that each email chain is just one "record" for FOIA purposes. *See Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 678-79 (D.C. Cir. 2016) (stating that if an agency "identifies a particular document or collection of material—such as a chain of emails—as a responsive

'record,'" in response to a FOIA request, then the entire chain is considered a "record" for purposes of FOIA); *Cause of Action Inst. v. DOJ*, 282 F. Supp. 3d 66, 70 (D.D.C. 2017) (describing how an agency produced an email chain "as a single record" under FOIA in light of it being a "grouping of information" (citations omitted)). The relevant question, then, is simply whether the Committee manifested its intent to control these email chains (and any attachments) by affixing the legend to each one of those chains. For the reasons explained above, it did.[8] *See supra* Section II.A.

Likewise, the Committee's instructions to the Agencies left no room for doubt regarding the future handling of the Legended Documents: The legend expressly indicates that the documents "remain subject to the Committee's control, and are entrusted to your agency *only* for use in handling this matter," and then goes on to explicitly restrict the production of the documents in response to any FOIA request. *See* JA751-52 ¶ 3 (emphasis added). In contrast with a "general"

---

[8] Because the Legended Documents here only involve emails from the Committee, attachments to those emails, and replies by Committee staffers to those emails, this Court need not consider how broadly other language in the legend not directly implicated in this case reaches. Likewise, because Committee staff made individualized decisions to exert control over each of the Legended Documents by manually affixing the legend to the email, this Court need not consider whether the automatic application of legends, such as in email signature blocks, would change the analysis. *See* JA752 ¶ 10 ("If a staff member decided to include the legend on an email, he or she had to specifically copy and paste the legend into that email.").

understanding, "consistent course of dealing," or "pre-existing agreement[]" between agencies and committees that communications will remain confidential, which this Court has deemed inadequate to restrict disclosure, *United We Stand*, 359 F.3d at 602, here the Committee left nothing to chance: It spelled out exactly who was in control over what documents, and for what purpose (including that they should *not* be disclosed under FOIA), all within the very same documents over which the Committee manifested its control. This "specific showing of congressional intent to control documents sought by FOIA requesters," *id.*, is all the law requires to limit disclosure under FOIA. For these reasons, the magistrate judge correctly concluded that "[t]he Committee's instructions are … sufficiently specific to limit the disclosure of the records." *See* JA664.

## C. The Committee's manifestation of intent was timely

By affixing the legend to the Legended Documents in real time while the Committee was exchanging emails with the Agencies, the Committee manifested its intent to control the documents in a timely fashion for purposes of FOIA. These instructions were communicated to the Agencies long before American Oversight submitted its FOIA requests, which is well in advance of what was required for a timely manifestation of intent to control. *See, e.g.*, *Holy Spirit*, 636 F.2d at 842 (rejecting assertion of control that was made "as a result" of a FOIA request). Congressional entities are not required to manifest intent at the exact moment

when a document is created or transmitted.  *See id.* (rejecting the argument "that Congress must give contemporaneous instructions when forwarding congressional records to an agency"); *see also ACLU I*, 105 F. Supp. 3d at 47 (rejecting the argument that "any evidence of congressional control 'must be contemporaneous with the transmission of the document'" (citation omitted)).

But even if contemporaneous manifestation were required, the Committee did so here: The Committee asserted control over the OMB document at the time it was created by including the legend in the transmittal email, *see* JA756, and asserted control over the HHS documents by including the legend even *before* the HHS employee sent each of the HHS documents to Committee staff, *see* JA800, JA805, JA809.  Critically, the facts here demonstrate that Congressional control over the Legended Documents was established well before American Oversight's FOIA request, meaning they were Congressional records at the time that request was received.

### D.    Deference is warranted because the Committee created and transmitted the Legended Documents in the exercise of its Article I authority

Because the Legended Documents were created and shared in the exercise of the Committee's Article I authority, special policy considerations favor according due deference to the Committee's manifestation of intent to control these documents.  *See Goland*, 607 F.2d at 348 n.48; *supra* Section I.C.  The district

court presumed, without explicitly deciding, that special policy considerations apply to the Legended Documents. It agreed that because Congress here was "involved in its lawmaking function," it "seems likely that special considerations still arguably exist." JA869.

That the Legended Documents involve the Committee's exercise of its Article I authority is obvious. Specifically, the communications exchanged between the Committee and the Agencies, along with the attachments to those email chains, demonstrate that the Committee's staff was involved in the legislative function when creating and transmitting them, including gathering information to inform its official legislative business.[9] These back-and-forth communications were each part of a broader conversation between the Committee and the Executive Branch regarding proposed health care reform legislation that Congress was then contemplating. *See Am. Oversight*, 101 F.4th at 920 ("In this case, the record makes clear that in the communications between the agencies and Congress, each side had an independent stake in the potential healthcare reform legislation under discussion.").[10]

_____

[9] The district court erred in questioning whether Committee staff had been appropriately delegated authority to act on behalf of the Committee. *See infra* Section III.A.2.

[10] *See also* JA106 ¶ 7 (noting the communications with OMB were "exchanged between individuals in the current [Republican] administration and Republican members of Congress and their staff, all of whom shared the common

Because these communications directly implicate Congress's Article I legislative powers, special policy considerations (and this Court's precedents) favor deferring to Congress's manifested intent to control them.[11]

## III. THE DISTRICT COURT COMMITTED NUMEROUS ERRORS IN CONCLUDING THAT THE LEGENDED DOCUMENTS ARE AGENCY RECORDS

This Court's Congressional-records test "accord[s] due deference to Congress' affirmatively expressed intent to control its own documents." *Jud. Watch*, 726 F.3d at 221 (quoting *Paisley*, 712 F.2d at 693 n.30). Despite this, the district court at each step misapplied the test, employing a non-deferential, multi-pronged analysis entirely unmoored from this Court's precedents. In doing so, it not only reached the wrong result about the Legended Documents here, but also created an unworkable, subjective standard that provides no clear guidance for

---

goal of enacting the [American Health Care Act], or legislation closely paralleling that bill"); JA204 ¶ 20 (noting that the redacted emails "were exchanged between individuals who shared the common goal of enacting health care reform legislation" and that if such communications were subject to release under FOIA, "the integrity of the legislative process would suffer").

[11] If this Court determines, contrary to the district court, that examining the redacted information in the Legended Documents is necessary to determine whether they are Congressional or agency records, the Court should vacate the decision below and remand to the district court to review in the first instance. The Committee welcomes *in camera* review of the documents if the Judiciary deems it necessary or relevant to deciding this case.

future Congressional entities seeking to protect the confidentiality of their

documents or agencies processing FOIA requests.

**A. The district court erred by discounting the objective indicia of Congressional intent to control and instead conducting a subjective inquiry into Congressional decision-making**

The district court misapplied the Congressional-records test by looking

behind the Committee's legend. Rather than deferring to the Committee's clear

written intent to retain control of specific documents, the district court applied a

subjective approach that entailed second-guessing Congressional decision-making

and drawing a baseless distinction between "formal oversight investigation[s]" and

other types of Article I legislative activity. JA874-875.

***1. The district court mistakenly inquired into whether the Committee was conducting a "formal oversight investigation," which is not relevant to the Congressional-records test***

Under the district court's approach, whether a Congressional entity is

engaged in a "specific oversight investigation or other function" is somehow

relevant to whether Congress asserted a "clear intent" to control. JA873. This is

wrong. Although the precedent cited by the district court involved more "formal"

oversight activities than the Committee was engaged in here, those cases do not

support, when Congress asserts control over its documents, drawing an artificial

distinction between "formal oversight investigation[s]," however that term is

defined, and other legislative activity. *See* JA873-74 (citing *Goland*, 607 F.2d at

343; *Holy Spirit*, 636 F.2d at 840-41; *Paisley*, 712 F.2d at 689-90; *United We Stand*, 359 F3d at 597; *ACLU II*, 823 F.3d at 659). The district court relied on this distinction as a significant factor in arriving at its conclusion, even though the precedents it cited never indicated that an "oversight function such as a letter or hearing" was necessary to trigger Congress's ability to assert control over its documents. *See* JA873.

Instead, whether documents remain Congressional records when shared with agencies involves application of the same control-based test regardless of whether they relate to an oversight investigation or pending legislation. This makes sense because no bright-line distinction between "oversight" communications and "legislative" communications with agencies exists.[12] Similarly, the district court's elevation of "formal oversight" over informal oversight and legislative activity finds no support in case law, *cf. McSurely v. McClellan*, 553 F.2d 1277, 1287 (D.C. Cir. 1976) (en banc) ("The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct."); *Jewish War Veterans v. Gates*, 506

---

[12] Instead, courts generally treat these as overlapping categories that both fall within Congress's legitimate legislative functions. *See Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes."); *Quinn*, 349 U.S. at 160 (Congress's power to investigate "is indeed co-extensive with the power to legislate.").

F. Supp. 2d 30, 57 (D.D.C. 2007) ("Congressmen and Senators do not mark information pertaining to an area of legislative interest as 'formally gathered' or 'informally gathered.'"), or the day-to-day practices of the House and other Congressional entities.  Rather, the only relevant question for whether the Congressional-records test applies is whether Congress was exercising its Article I authority, *see supra* Section I.C., not whether it "formally" authorized the activity through a letter or hearing.

Here, the Committee and Agencies communicated about legislative and policy proposals for health care reform.  These types of communications serve valid legislative purposes because they involve information-gathering, monitoring agency views on proposed reforms, or coordinating on common legislative goals.  Whether these communications were in the form of letters or emails and whether they are categorized as "oversight" or "legislative" does not affect the Committee's ability to assert control over them because, in any case, it was exercising its Article I authority.  *See supra* Section II.D.

### 2. *The district court erred by second-guessing whether Committee staffers were properly authorized to affix the legend*

Next, the district court discounted the Committee's application of the legend as "a decision by one staffer to attach a footer to an email," which it contrasted with "other D.C. Circuit cases in which the committee, or a staffer who had the

authority to speak on behalf of the committee, articulated an intent to control certain documents." JA875-76. This conclusion was erroneous because the record below established that when Committee staff affixed the legend here, they were acting with authority delegated to them by the Committee and were speaking on behalf of the Committee itself.

To start, Article I of the Constitution vests all federal "legislative Powers … in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. Those powers are "not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole." *United States v. Ballin*, 144 U.S. 1, 7 (1892).

The Constitution also grants Congress the authority to manage its own documents and decide how to delegate authority to staff. The Rulemaking Clause, for example, provides that "[e]ach House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. This Clause provides Congress with power to make its own rules, within constitutional limitations, that is "absolute and beyond the challenge of any other body or tribunal." *Ballin*, 144 U.S. at 5.[13]

---

[13] The Constitution further guarantees Congress's legislative independence through constitutional protections such as the Journal Clause, U.S. Const. art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy …."), and the Speech or Debate Clause, *id.* art. I, § 6, cl. 1 ("[F]or any Speech or

Pursuant to its Article I authority, the House has delegated its legislative and oversight powers to, among other entities, its standing committees. Congress exercises the bulk of its legislative and oversight jurisdiction through standing and ad hoc committees. *See, e.g.*, Rule X, Rules of the House of Representatives, 119th Cong. (2025) (House Rules) (organization of House committees, including legislative jurisdiction, oversight responsibilities, and committee staffs), https://perma.cc/EQD2-LZCQ; House Rule XI (committee procedures for adopting rules, managing records, and issuing subpoenas).[14] The Committee on Ways and Means is a standing committee with jurisdiction over revenue measures and deposit of public monies, among other things. House Rule X.1(t). At the time the

---

Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."). The Congress that passed FOIA understood that the Framers expressly granted "secrecy" to Congress alone by "requir[ing] [Congress] to publish [a journal] excepting those portions which the Congress, in its judgment, deemed required secrecy." *Federal Public Records Law (Part 1): Hearings Before a Subcomm. of the H. Comm. on Gov't Operations*, 89th Cong. 65 (1965) (statement of Rep. John Moss, Chairman, Foreign Operations and Gov't Info. Subcomm.).

[14] The relevant rules were substantively the same at the time the Committee exchanged the Legended Documents with the Agencies. *See* Rules X & XI, Rules of the House of Representatives, 115th Cong. (2017), https://perma.cc/9JW4-43GU.

emails at issue here were exchanged with the Agencies, the Committee took particular interest in tax matters related to health care reform.[15]

While Congressional committees are composed of Members, they are staffed by non-Members, and it is the non-Member staff who, at the direction of the Members, do a substantial amount of the fact-gathering and technical analysis as well as drafting and formulating of legislative and policy proposals that underpin the work of Congressional committees.[16]  As the Supreme Court has recognized, "a Member and his aide[s] are to be 'treated as one,'" because "it is literally impossible, in view of the complexities of the modern legislative process, … for Members of Congress to perform their legislative tasks without the help of aides and assistants," and therefore "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos."

---

[15]  *Cf.* House Rule X.2(c), (d)(1) (requiring the Committee to "review and study on a continuing basis the impact of tax policies affecting subjects within its jurisdiction"); *see also* Comm. on Oversight and Gov't Reform, Authorization and Oversight Plans for all House Committees, H. Rep. No. 115-69, at 232 (2017) (outlining the Committee's plans to conduct "oversight and other activities" on tax provisions contained in the Affordable Care Act).

[16]  Consistent with these principles, Committee rules applicable when the Legended Documents were exchanged provided that "[t]he staff of the Committee shall be under the general supervision and direction of the Chairman of the full Committee."  Rule 22, Rules of the Committee on Ways and Means of the U.S. House of Representatives, 115th Cong. (2017), https://perma.cc/98EK-HR7F.

*Gravel v. United States*, 408 U.S. 606, 616-17 (1972) (applying the Speech or Debate Clause).

The district court erred in reading this Court's precedent to attribute relevance to the seniority level of the individual asserting Congress's intent to control documents. *See* JA876-77 (citing *ACLU II*, 823 F.3d at 664-65; *United We Stand*, 359 F.3d at 597; *Goland*, 607 F.2d at 347-48). Those cases may have involved an assertion from "either the Committee's leadership or a high-level staffer … such as the Chief of Staff," JA876 (citations omitted), but that does not distinguish them in any relevant manner from this case, where Committee staff members affixed the legend pursuant to authority delegated by the Committee itself, JA752. In other words, they affixed the legend on behalf of the Committee, not themselves. It is simply immaterial that the legend was affixed by individual Committee staff members rather than pursuant to a vote or a formal letter from the full Committee, and no case holds or suggests the contrary.

Further, the court's concern that "congressional staffers could simply insert this footer into any email correspondence based on unspecified criteria and unclear, if any, review of such a decision" misses the mark for at least two reasons. *See* JA881. First, as noted above, the "congressional staffers" at issue here were authorized by the Committee to apply the legend, and the Committee was authorized by the House to exercise its Article I powers. Second, it is not for

courts to second-guess whether there are sufficient criteria by which the Committee authorizes its own staff to assert control of Committee documents. Such an approach violates the separation of powers by intruding into the House's ability to write its own rules, govern its own affairs, and supervise its own staff. *See infra* Section IV.

In sum, which Committee staffer affixed the legend to the Legended Documents is not the relevant question here. Rather, it is whether the Committee staff were acting pursuant to delegated authority from the Committee when they affixed the legends. As the Committee's General Counsel made clear, "staff members were authorized by the Committee to include the legend on emails when deemed appropriate." JA752 ¶ 10. The district court erred in discounting this declaration and second-guessing the Committee's delegation of authority to its staff respecting their use of the legend.

### 3. *The district court wrongly concluded that the Committee's assertion of control lacked sufficient specificity*

Finally, the district court viewed the legend as too "generic and far-reaching" to show that the Committee manifested an intent to control the Legended Documents. JA879-81. This approach belies the fact that each of the five Legended Documents at issue in this appeal contain the legend. Among the hundreds of documents produced by the Agencies in response to Appellee's FOIA request, JA852-53, only five are at issue in this appeal, and each bears the legend.

This shows that the legend was, in fact, applied specifically to the documents the Committee intended to control for FOIA purposes. *See supra* Section II.B. Whether the legend could apply to other documents is not at issue here.

Further, none of the cases relied upon by the district court change this analysis. JA881 (citing *United We Stand*, 359 F.3d at 602). In fact, the legend is similar in relevant part to the legend in *United We Stand*, which stated that the "document is a Congressional record … entrusted to the Internal Revenue Service for your use only" and that it "may not be disclosed without the prior approval of the Joint Committee." 359 F.3d at 600-01. *United We Stand* also advised that if the committee there "intended to keep confidential not just 'this document' but also the IRS response, it could have done so by referring to 'this document and all IRS documents created in response to it.'" *Id.* at 601. Here, the legend shows the Committee was following this Court's guidance. *See* JA661 n.4. And here, unlike prior cases, "the Committee's manifestation was not based on a general understanding of confidentiality with no external indica affixed to the documents." JA664 (referring to *United We Stand* and *Paisley*). Instead, it was affixed to the documents themselves.

The district court's criticism of the legend as "boilerplate" because staff copied and pasted it to emails also misapprehends the significance of how the legend was created and applied. Contrary to the district court's (unsupported)

view, consistency is a manifestation of rigor and top-down decision-making, not lack of consideration. While Congress need not "act in a particular way in order to preserve its FOIA exemption for transferred documents," *Holy Spirit*, 636 F.2d at 842, or conform to "procedural niceties" in asserting control, *Goland* 607 F.2d at 347 n.45, the consistent use of uniform language to assert control over specific documents reflects a choice by the Committee itself, not simply staffers acting on their own.

### B. The district court erred in concluding that the Agencies were free to use the documents "as they saw fit" because the Agencies never had exclusive control over them

The questions of Congressional intent to control documents (factor one) and an agency's ability to use documents as it sees fit (factor two) "represent two sides of the same coin." *ACLU I*, 105 F. Supp. 3d at 45. As this Court has explained, "Congress's intent to control and the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the FOIA request is directed must have exclusive control of the disputed documents.'" *United We Stand*, 359 F.3d at 600 (quoting *Paisley*, 712 F.2d at 693). This means that if "Congress has manifested its own intent to retain control, then the agency—by definition—cannot lawfully 'control' the documents," *Paisley*, 712 F.2d at 693 (footnote omitted), and the documents are not agency records. The district court failed to heed this admonition, concluding that the Legended Documents were

41

agency records because the Agencies used the documents "as they saw fit" and never "agreed to the terms of the [l]egend." JA882-83.

But when Congress manifests its intent to control a document that is exchanged with an agency during legislative business, as the Committee did here, the possessing agency, under this Court's precedent, cannot have "exclusive control" over the document, even if it has wide latitude to use it for its own business. *See United We Stand*, 359 F.3d at 600. Rather, clear Congressional intent to control documents for FOIA purposes can only be overcome if "Congress subsequently acted to vitiate the intent to maintain exclusive control over the documents that was manifested at the time of the documents' creation." *ACLU II*, 823 F.3d at 664.

Here, the Agencies never had "exclusive control" of the Legended Documents. As described above, *see supra* Section II, the Committee's manifestation of intent to control the Legended Documents was clear and specific. And the record contains no evidence that the Committee ever relinquished its intent to control the Legended Documents. *See Cox v. DOJ*, 111 F.4th 198, 212 (2d Cir. 2024) (observing that a Senate committee's letter granting the President "some ability to make use of the report … does not vitiate the Committee's intent to control it"). Thus, even though the Agencies could and did use the Legended Documents for purposes related to health care legislation, that does not change the

analysis here.  The legend authorized the Agencies to "use" the documents "in handling this matter"—i.e., the health care reform questions under discussion. JA751-52.  The Committee's choice to afford the Agencies discretion to use the documents "is not the same as surrendering control."  *Cox v. DOJ*, No. 17-CV-3329, 2022 WL 21304584, at *8 (E.D.N.Y. Mar. 30, 2022), *aff'd*, 111 F.4th 198 (2d Cir. 2024).

The district court erred in interpreting the Agencies' use of the documents as overriding the Committee's assertion of intent to control.  *See* JA882-86.[17]  As the legend itself makes clear, Congress never granted the Agencies the ability to "use and dispose of the record[s] as [they] s[aw] fit," the relevant standard under step two of the Congressional-records test.  *See Jud. Watch*, 726 F.3d at 218 (citation omitted).  The Committee understood that the Agencies would rely on the Legended Documents and did not restrict their ability to integrate them into agency systems or files for the purpose of handling the matter at hand.  But the Committee never intended to hand over exclusive control of the documents for FOIA purposes, which is exactly why it retained control of them.  And even if the Agencies' subsequent actions were incongruent with what the legend permitted (i.e.,

---

[17]  If a Congressional entity were somehow vague in manifesting its intent to maintain control of the records, the second factor of this test could be independently relevant for determining whether they were Congressional records. *See supra* Section I.B.  That is not the case here.  *See supra* Section II.

producing them in response to a FOIA request), they could not negate the Committee's control of the documents given its clear manifestation of control up front. *See, e.g.*, *United We Stand*, 359 F.3d at 600 (noting the focus is on "Congress's intent to control (and not on the agency's)" (citation omitted)); *ACLU I*, 105 F. Supp. 3d at 45 ("The Court's inquiry … is a streamlined one: do there exist 'sufficient indicia of congressional intent to control' [the document]?" (citation omitted)).

Further, no case requires agency agreement with Congress to classify a document as a Congressional record. While this Court's leading precedents have generally involved such a consensus, *see, e.g.*, *Jud. Watch*, 726 F.2d at 218-19; *United We Stand*, 359 F.3d at 598, none of the cases *required* it. The agencies' agreement in those cases was never the decisive factor in determining whether Congress clearly manifested an intent to control. The Congressional-records test focuses on whether Congress *objectively* manifested an intent to control, not whether an agency subsequently agreed with the assertion. *See Allen v. Dep't of Def.*, 580 F. Supp. 74, 80 (D.D.C. 1983) ("The absence of a formal memorandum of agreement designating some materials as 'congressional' for FOIA purposes is not fatal to defendant's claim in the face of such strong evidence of congressional intent to retain concurrent control."); *ACLU I*, 105 F. Supp. 3d at 47 (finding "little consequence" to diverging agency understandings of the scope of a Senate

Committee's intent to control its documents because the "inquiry focuses on 'Congress' intent to control (and not on the agency's)'" (quoting *United We Stand*, 359 F.3d at 600)).

Moreover, the Agencies never objected to the Committee's assertion of control over the Legended Documents while the relevant emails were being exchanged. To the extent that this Court concludes that the Agencies' views are relevant notwithstanding Congress's manifestation of a clear intent to control, it should require agencies to contest Congress's assertion of control at the time it is made. Otherwise, Congressional entities will proceed in their communications with the Executive Branch under the assumption that they are Congressional records, only to have the rug pulled out from under them at a later date.

## IV. BY ENABLING EXECUTIVE AND JUDICIAL SECOND-GUESSING OF INTERNAL CONGRESSIONAL AFFAIRS, THE DISTRICT COURT'S APPROACH IS INCONSISTENT WITH THE SEPARATION OF POWERS

As this Court explained in *Goland*, courts must accord "due weight" to "Congress' clear intent to exempt congressional documents from disclosure under FOIA." 607 F.2d at 348 n.48. The district court's approach—looking beyond the legend to scrutinize questions about the seniority level of the individual who affixed the legend, or whether the documents were connected to some "formal" oversight investigation, among others—was not only untethered to this Court's precedent, but was also inconsistent with the separation of powers. If endorsed by

this Court, it "would force Congress 'either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role.'" *United We Stand*, 359 F.3d at 599 (quoting *Goland*, 607 F.2d at 346). It would also require the Executive and Judicial Branches to impermissibly intrude into Congress's internal operations.

*First*, the district court's look behind the legend intrudes on Congress's authority under Article I to govern its internal affairs. The district court's view that the legend "does not reflect the considered judgment that has previously been held to manifest Congress's clear intent," JA871, is not only a misapplication of precedent, *see supra* Sections II and III, it is insufficiently deferential to Congress's authority to oversee its own staff, conduct oversight and legislative activity without outside interference, and control its own documents. *See, e.g.*, U.S. Const. art. I § 1 (vesting Congress with "[a]ll legislative Powers herein granted"); *id.* § 5, cl. 2 (granting Congress authority to "determine the Rules of its Proceedings").

For instance, the court's faulty reading of precedent led it to attribute some significance to the seniority level of the staffer who applied the legends in this case. *See supra* Section III.A.2. No case law supports such intrusive scrutiny of Congress's authority to delegate its powers to Congressional staff or to superintend the details of how a delegation was made or its breadth. Instead, the Constitution gives Congress the exclusive power to make those decisions through its own rules.

*Ballin*, 144 U.S. at 5.  Accordingly, the official actions of the Committee staff members here were the actions of the Committee itself.  *See supra* Section III.A.2.  Moreover, Congressional entities delegating authority to staff is not a novel concept.  Just as agency heads delegate FOIA tasks to agency staff, committee chairs delegate technical communications to their experts.

The district court's approach would pose separation-of-powers problems by permitting the Executive and Judicial Branches to conduct a subjective inquiry into Congressional decision-making.  By shifting to those coordinate branches the decisions about whether a sufficiently senior official specifically approved of the legend being affixed to a particular document or whether a Congressional entity's delegation of authority to affix the legend was sufficiently narrow, it would give agency FOIA officers, and eventually federal judges, substantial authority over how Congress orders its internal affairs—making them the gatekeepers of what the public sees from Congress.  The Constitution does not tolerate such an intrusion into day-to-day Congressional decisions about its own processes and operations.  *Cf. Jud. Watch*, 726 F.3d at 226-29 (discussing the separation-of-powers problems with extending FOIA to the Office of the President).

Notably, the district court's interpretation of FOIA in this context would stretch the meaning of "agency records" to raise these serious constitutional issues where the text can fairly be read to avoid it.  *Id.* at 226 (citation omitted); *see also*

*Jud. Watch v. Dep't of Energy*, 412 F.3d 125, 132 (D.C. Cir. 2005) (relying on the canon of constitutional avoidance and the "special considerations" test, which "control[s] when the Executive Branch's interest in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated" (citation omitted).

***Second***, the district court's approach would chill Congressional oversight and legislative collaboration with the Executive Branch, thus interfering with Congress's core constitutional prerogatives.  Congress "should not be forced to abandon either its long-acknowledged right to keep its records secret" or its "ability to oversee the activities of federal agencies (a supervisory authority it exercises partly through exchanges of documents with those agencies 'to facilitate their proper functioning in accordance with Congress' originating intent')." *McGehee v. CIA*, 697 F.2d 1095, 1107-08 (D.C. Cir. 1983) (quoting *Goland*, 607 F.2d at 346); *see also Cox v. DOJ*, 504 F. Supp. 3d 119, 148 (E.D.N.Y. 2020) ("FOIA is not best read as a statute that forces a choice between congressional oversight and the very congressional secrecy the statute protects by exempting Congress from its coverage."), *aff'd*, 111 F.4th 198 (2d Cir. 2024).

If affirmed, the district court's subjective approach would provide Congressional entities with no clarity on how to maintain control and protection over documents exchanged with agencies, bringing these concerns to life.

Congressional entities would have to guess how an agency FOIA officer and court might weigh the various factors the district court considered here and analyze the potential that certain factors outweigh their instructions provided in a legend. Without clear, objective standards to follow, Congressional entities cannot know beforehand whether certain documents are theirs or whether, when, and how a FOIA officer or court might conclude that "exclusive control" has passed to an agency. Such an approach "would seriously impair Congress's oversight role," *see Ryan v. DOJ*, 617 F.2d 781, 785 (D.C. Cir. 1980), and undermine its constitutional prerogative to keep its own materials confidential. It would also be exceptionally difficult for Executive Branch FOIA officers to apply the district court's standard, as the requested documents will not set forth who authorized the application of a legend or the specificity of the delegation a staffer received to affix the legend. For the same reason, the district court's standard would make FOIA litigation more prevalent and cumbersome.

Further, the district court's approach would have far-reaching effects beyond the Committee and five documents at issue here. It would affect the entire Legislative Branch, which encompasses dozens of Congressional committees, the Congressional Budget Office, the General Accounting Office, the Government Printing Office, the Architect of the Capitol, and the Congressional Research Service, among others. To legislate effectively, Congress must be able to inquire

freely, without the fear that every preliminary thought will be splashed across the front page of a newspaper, particularly on sensitive issues that are inappropriate for public disclosure. If every draft, query, and informal exchange between a Congressional staff member and agency expert could be subject to FOIA based on a multipronged subjective approach, future Congressional entities may pull punches or be less aggressive or creative in their legislative and oversight inquiries to agencies.

*Third*, although the district court expressed concern about broadening the scope of FOIA exemptions in a manner inconsistent with its animating purpose, this is not a case about the list of exemptions set forth in FOIA, and it is the district court's shoehorning of the Committee's records into the definition of "agency records" that broadens FOIA beyond its intended meaning. While it is true that a "spirit of broad disclosure animates the Act," *Paisley*, 712 F.2d at 696, Congress intended FOIA to cast a searchlight on "agencies"—a term that does not include Congress, the Judicial Branch, or the Office of the President, 5 U.S.C. § 551(1)); *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).[18]

---

[18] The official records of Congress are widely available to the public. Federal law states that Congressional records should be preserved with the National Archives and Records Administration. 44 U.S.C. § 2118.

Indeed, FOIA's legislative history and structure reveal Congress's intent to exclude specific entities based on separation-of-powers concerns. *See supra* Section I.A; *see also Kissinger*, 445 U.S. 136, 156 (1980) (observing that Congress intended to exclude the Office of the President from FOIA). Just as extending FOIA to the Office of the President would "raise a constitutional issue of separation of powers," *Ryan*, 617 F.2d at 788 n.19, so too would applying it to Congressional documents. Congress's decision to exclude itself from FOIA was deliberate, given the interest in avoiding the harm that compelled disclosure of its materials would have on its own independence from the other branches. *See supra* Section I.A. Over the years, while Congress has repeatedly considered updates to FOIA, it has not amended FOIA to make its own documents subject to disclosure.[19]

---

[19] Congress has reaffirmed its decision to exclude itself from FOIA's coverage in subsequent deliberations over amending FOIA. *See, e.g.*, *To Eliminate Congressional and Federal Double Standards: Hearing on S. 1112 Before the Subcomm. on Oversight of Gov't Mgmt. of the S. Comm. on Governmental Affs.*, 96th Cong. 1 (1979) (opening statement of Sen. Carl Levin, Chairman, Subcomm. on Oversight of Gov't Mgmt.) (observing that bill to eliminate Congress's exclusion from FOIA and other statutes "raises some constitutional questions regarding the separation of powers and the [S]peech [or] [D]ebate [C]lause"); J. Comm. on the Org. of Cong., Organization of the Congress, H. Rep. No. 103-413, vol. 2, at 142 (1993) (warning that applying FOIA to Congressional records "might impinge on Congress' privilege with regard to its papers, pose administrative burdens on congressional offices, and involve Congress in lawsuits filed by persons appealing the denial of their FOIA requests"); *see also id.* at 141-42 (noting that requests for Congressional documents "implicate the privileges of the House and Senate" which are "root[ed] in the Constitution['s] … [S]peech or

Instead, FOIA is targeted at agencies because, unlike Congress, agencies are not directly responsible to the people.  Comm. on the Judiciary, Clarifying and Protecting the Right of the Public to Information, and for Other Purposes, S. Rep. No. 89-813, at 3 (1965) (emphasizing the importance of a policy of disclosure for "the hundreds of departments, branches, and agencies which are not directly responsible to the people").

*Fourth*, this Court's reasoning in *American Oversight v. HHS*, 101 F.4th 909 (D.C. Cir. 2024), further supports deferring to the Committee's authority to retain control over its own documents.  This Court held that because the Committee has an "independent stake" in the outcome of health care reform legislation, its communications about that topic with the Agencies were not protected by the consultant corollary doctrine of FOIA Exemption 5.  *Id.* at 912.  But Congress's "particular institutional stake in the legislative process," *id.* at 920, would mean little in the Congressional records context if a Congressional entity's explicit assertion of control were subject to intrusive questions from the other branches of government about the seniority level of the individual conveying the assertion of control or whether it has taken a "formal oversight" action.[20]

_____

[D]ebate [C]lause … publication clause [U.S. Const. art. I, § 5, cl. 3] … and the separation of powers doctrine").

[20]  The stakes are high for Congress here.  Previously, these types of Congress-to-agency communications were conceivably protected by: (1) FOIA

***Finally***, this case raises no other separation-of-powers concerns, such as Congress's use of the legend to assert "control" of an agency's functions or seize internal agency documents.  The only relief the Committee seeks here—consistent with the only legal consequence that flows from a decision concluding that a document is a Congressional record—is a court order stating the Legended Documents are not subject to FOIA.  Moreover, any concerns about potentially overbroad applications of the legend are questions for another day given that the Legended Documents here solely consist of direct email communications between Committee staff and the Agencies as well as attachments to those emails.

Additionally, this Court must apply a presumption of regularity, meaning that Congressional entities are presumed to act in good faith and appropriately, as the Committee did here, in affixing the legend and asserting control over future

---

Exemption 5, which both the Committee and the Agencies understood to cover the communications at issue in this case at the time they were sent and until this Court's recent ruling; and (2) the Congressional-records test.  Now that FOIA Exemption 5 likely no longer covers these types of communications, in many cases the Congressional-records test is the sole defense for Congressional entities that want to protect their documents from disclosure.  This development further supports a deferential approach to Congress, in contrast with the district court's approach that would have negative repercussions for the separation of powers.  *Cf. Am. Oversight*, 101 F.4th at 925 (Wilkins, J., concurring in part and dissenting in part) (expressing concerns that the "majority's rule will chill communications between Congress and the Executive, stymie the working relationship between Congress and the Executive, and inhibit the President's ability to perform effectively the core Article II duty of recommending legislation to the Congress").

documents.  *See, e.g.*, *Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*, 464 F. Supp. 3d 228, 245 (D.D.C. 2020) ("These declarations are accorded a presumption of regularity."); *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) ("[G]overnment officials are presumed to act in good faith . . . . [P]laintiff must present 'well-nigh irrefragable proof' of bad faith or bias on the part of governmental officials in order to overcome this presumption." (citation omitted)). And consistent with that presumption, there is no evidence that Congress has attempted to leverage this Court's FOIA jurisprudence to disrupt an agency's internal operations.

## CONCLUSION

For the foregoing reasons, this Court should reject the district court's application of the Congressional-records test, hold that the Legended Documents are not agency records, and reverse the judgment below.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry
  *General Counsel*
Todd B. Tatelman
  *Deputy General Counsel*
Brooks M. Hanner
  *Associate General Counsel*
Kenneth C. Daines
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Defendant-Intervenor-Appellant*

February 9, 2026

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,819 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman type.

*/s/ Matthew B. Berry*
Matthew B. Berry

**CERTIFICATE OF SERVICE**

I certify that on February 9, 2026, I filed one copy of the foregoing brief and accompanying Joint Appendix via the CM/ECF system of the United States Court of Appeals for the District of Columbia Circuit, which I understand caused service on all registered parties.

*/s/ Matthew B. Berry*
Matthew B. Berry

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

## UNITED STATES CONSTITUTION

Article I, Section 1 .......................................................................Add. 1

Article I, Section 5, Clause 2 ......................................................Add. 1

Article I, Section 5, Clause 3 ......................................................Add. 1

Article I, Section 6, Clause 1 ......................................................Add. 1

## RULES

Rules of the House of Representatives, 119th Cong. (2025) (Excerpts) ..........Add. 2

    House Rule X (Organization of Committees) ........................................Add. 2

        Clause 1 (Committees and Their Legislative Jurisdictions).............Add. 2

        Clause 2 (General Oversight Responsibilities)................................Add. 3

        Clause 9 (Committee Staffs).............................................................Add. 4

    House Rule XI
    (Procedures of Committees and Unfinished Business) .........................Add. 4

        Clause 1 (In General)........................................................................Add. 4

        Clause 2 (Adoption of Written Rules) ..............................................Add. 5

Rules of the Committee on Ways and Means of the U.S. House of
Representatives, 115th Cong. (2017) (Excerpt)................................Add. 6

        Rule 22 (Supervision of Committee Staff)...........................Add. 6

## STATUTES

5 U.S.C. § 551 (Excerpt)...............................................................Add. 7

5 U.S.C. § 552 (Excerpts) .............................................................Add. 7

# UNITED STATES CONSTITUTION

## Article I, Section 1

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

## Article I, Section 5, Clause 2

Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

## Article I, Section 5, Clause 3

Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

## Article I, Section 6, Clause 1

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States.  They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

# RULES

**RULES OF THE HOUSE OF REPRESENTATIVES, 119TH CONG. (2025) (EXCERPTS)**

## Rule X (Organization of Committees)

### *Clause 1 (Committees and Their Legislative Jurisdictions)*

There shall be in the House the following standing committees, each of which shall have the jurisdiction and related functions assigned by this clause and clauses 2, 3, and 4. All bills, resolutions, and other matters relating to subjects within the jurisdiction of the standing committees listed in this clause shall be referred to those committees, in accordance with clause 2 of rule XII, as follows:

…

**(t) Committee on Ways and Means**

(1) Customs revenue, collection districts, and ports of entry and delivery.

(2) Reciprocal trade agreements.

(3) Revenue measures generally.

(4) Revenue measures relating to insular possessions.

(5) Bonded debt of the United States, subject to the last sentence of clause 4(f).

(6) Deposit of public monies.

(7) Transportation of dutiable goods.

(8) Tax exempt foundations and charitable trusts.

(9) National social security (except health care and facilities programs that are supported from general revenues as opposed to payroll deductions and except work incentive programs).

# Clause 2 (General Oversight Responsibilities)

(a) The various standing committees shall have general oversight responsibilities as provided in paragraph (b) in order to assist the House in—

> (1) its analysis, appraisal, and evaluation of—

>> (A) the application, administration, execution, and effectiveness of Federal laws; and

>> (B) conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation; and

> (2) its formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate.

(b)(1) In order to determine whether laws and programs addressing subjects within the jurisdiction of a committee are being implemented and carried out in accordance with the intent of Congress and whether they should be continued, curtailed, or eliminated, each standing committee (other than the Committee on Appropriations) shall review and study on a continuing basis—

> (A) the application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction;

> (B) the organization and operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction;

> (C) any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction (whether or not a bill or resolution has been introduced with respect thereto); and

> (D) future research and forecasting on subjects within its jurisdiction.

…

(c) Each standing committee shall review and study on a continuing basis the impact or probable impact of tax policies affecting subjects within its jurisdiction as described in clauses 1 and 3.

(d)(1) Not later than March 1 of the first session of a Congress, each standing committee (other than the Committee on Appropriations, the Committee on Ethics,

and the Committee on Rules) shall, in a meeting that is open to the public, adopt its authorization and oversight plan for that Congress. Such plan shall be submitted simultaneously to the Committee on Oversight and Government Reform and the Committee on House Administration.

### Clause 9 (Committee Staffs)

(a)(1) Subject to subparagraph (2) and paragraph (f), each standing committee may appoint, by majority vote, not more than 30 professional staff members to be compensated from the funds provided for the appointment of committee staff by primary and additional expense resolutions. Each professional staff member appointed under this subparagraph shall be assigned to the chair and the ranking minority member of the committee, as the committee considers advisable.

…

(b)(1) The professional staff members of each standing committee—

> (A) may not engage in any work other than committee business during congressional working hours; and

> (B) may not be assigned a duty other than one pertaining to committee business.

## Rule XI (Procedures of Committees and Unfinished Business)

### Clause 1 (In General)

(b)(1) Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X. Subject to the adoption of expense resolutions as required by clause 6 of rule X, each committee may incur expenses, including travel expenses, in connection with such investigations and studies.

### *Clause 2 (Adoption of Written Rules)*

(a)(1) Each standing committee shall adopt written rules governing its procedure. Such rules—

> (A) shall be adopted in a meeting that is open to the public unless the committee, in open session and with a quorum present, determines by record vote that all or part of the meeting on that day shall be closed to the public;

> (B) may not be inconsistent with the Rules of the House or with those provisions of law having the force and effect of Rules of the House;

> (C) shall in any event incorporate all of the succeeding provisions of this clause to the extent applicable; and

> (D) shall include provisions to govern the implementation of clause 4 as provided in paragraph (f) of such clause.

(2) Each committee shall make its rules publicly available in electronic form and submit such rules for publication in the Congressional Record not later than 60 days after the chair of the committee is elected in each odd-numbered year.

(3) A committee may adopt a rule providing that the chair be directed to offer a motion under clause 1 of rule XXII whenever the chair considers it appropriate.


### *Committee Records*

(e)(2)(A) Except as provided in subdivision (B), all committee records (including hearings, data, charts, and files) shall be kept separate and distinct from the congressional office records of the member serving as its chair. Such records shall be the property of the House, and each Member, Delegate, and the Resident Commissioner shall have access thereto.

…

(e)(3) Each committee shall include in its rules standards for availability of records of the committee delivered to the Archivist of the United States under rule VII. Such standards shall specify procedures for orders of the committee under clause 3(b)(3) and clause 4(b) of rule VII, including a requirement that nonavailability of a record for a period longer than the period otherwise applicable under that rule shall be approved by vote of the committee.

*Power to Sit and Act; Subpoena Power*

(m)(1) For the purpose of carrying out any of its functions and duties under this rule and rule X (including any matters referred to it under clause 2 of rule XII), a committee or subcommittee is authorized (subject to subparagraph (3)(A))—

>   (A) to sit and act at such times and places within the United States, whether the House is in session, has recessed, or has adjourned, and to hold such hearings as it considers necessary; and

>   (B) to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary.

## RULES OF THE COMMITTEE ON WAYS AND MEANS OF THE U.S. HOUSE OF REPRESENTATIVES, 115TH CONG. (2017) (EXCERPT)

### Rule 22 (Supervision of Committee Staff)

The staff of the Committee shall be under the general supervision and direction of the Chairman of the full Committee except as provided in clause 9 of Rule X of the Rules of the House of Representatives concerning Committee expenses and staff.

Pursuant to clause 6(d) of Rule X of the Rules of the House of Representatives, the Chairman of the full Committee, from the funds made available for the appointment of Committee staff pursuant to primary and additional expense resolutions, shall ensure that each Subcommittee receives sufficient staff to carry out its responsibilities under the rules of the Committee, and that the minority party is fairly treated in the appointment of such staff.

**STATUTES**

**5 U.S.C. § 551 (Excerpt)**

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia; or except as to the requirements of section 552 of this title—

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

**5 U.S.C. § 552 (Excerpts)**

(a) Each agency shall make available to the public information as follows:

…

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the

time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

…

(4)(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

…

(f) For purposes of this section, the term—

(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.