**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5375**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN OVERSIGHT,

Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES AND OFFICE OF MANAGEMENT AND BUDGET,

Defendants-Appellees,

COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF
REPRESENTATIVES,

Defendant-Intervenor-Appellant.

On Appeal from the United States District Court
for the District of Columbia

## RESPONSE BRIEF FOR DEFENDANTS-APPELLEES

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici

Plaintiff-appellee is American Oversight. Defendants-appellees are the United States Department of Health and Human Services and the Office of Management and Budget. Appellant is the Committee on Ways and Means of the United States House of Representatives, which intervened as a defendant in district court. There are no amici.

## B. Rulings Under Review

Appellant seeks review of the memorandum opinion (Dkt. No. 114) and order (Dkt. No. 115) entered on September 24, 2025, and the final judgment (Dkt. No. 117) entered on September 30, 2025, by the Honorable Emmet G. Sullivan in Case No. 1:17-cv-827.

## C. Related Cases

This case was previously before the Court. *American Oversight v. HHS*, No. 22-5281 (D.C. Cir.). Counsel is unaware of any related cases under the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Michael Shih*
MICHAEL SHIH

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION .....................................................3

STATEMENT OF THE ISSUE .............................................................3

STATEMENT OF THE CASE ..............................................................4

     A.     Statutory Background ................................................4

     B.     Factual Background ..................................................5

     C.     Prior Proceedings ....................................................8

     D.     The Decision On Review ........................................10

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW ..................................................................14

ARGUMENT ......................................................................................15

THE DISTRICT COURT CORRECTLY CONCLUDED THAT
THE DISPUTED BACK-AND-FORTH EMAIL
EXCHANGES BETWEEN AGENCY PERSONNEL AND
CONGRESSIONAL STAFFERS ARE AGENCY RECORDS
SUBJECT TO FOIA. ..........................................................................15

     A.     Whether the Email Exchanges Are Subject to FOIA
              Turns on the Intent of the Creators and Whether the
              Agencies Can Use and Dispose of Their Copies. ...................15

     B.     The Applicable Test Confirms that Congress Does Not
              Control the Email Exchanges. ..............................................18

1.    There is no clearly expressed intent for Congress to control the email exchanges. ....................................18

2.    The agencies indisputably used the email exchanges to serve Executive Branch interests as they saw fit. ................................................26

C.    The Committee's Contrary Arguments Lack Merit. ............29

CONCLUSION ...............................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Cases:**                                                      **Page(s)**

*American Civil Liberties Union v. Central Intel. Agency,*
823 F.3d 655 (D.C. Cir. 2016) ........................................ 12, 17, 19, 21, 22, 29, 30, 36

*American Oversight v. U.S. Dep't of Health & Hum. Servs.,*
101 F.4th 909 (D.C. Cir. 2024) ...................................................... 9, 20

*Cause of Action Inst. v. Office of Mgmt. & Budget,*
10 F.4th 849 (D.C. Cir. 2021) .......................................................... 14

*Goland v. Central Intel. Agency,*
607 F.2d 339 (D.C. Cir. 1978) .............................................. 16, 21, 29

*Holy Spirit Ass'n for the Unification of World Christianity v. Central Intel. Agency,*
636 F.2d 838 (D.C. Cir. 1980) ........................................................ 19

*Judicial Watch, Inc. v. U.S. Secret Serv.,*
726 F.3d 208 (D.C. Cir. 2013) ................................. 15, 16, 17, 26, 39

*Paisley v. Central Intel. Agency,*
712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds,* 724 F.2d 201 (D.C. Cir. 1984) ...... 13, 18, 19, 24, 25, 26, 30, 31, 35, 36

*Tax Analysts v. U.S. Dep't of Just.,*
845 F.2d 1060 (D.C. Cir. 1988) ...................................................... 16

*U.S. Dep't of Just. v. Tax Analysts,*
492 U.S. 136 (1989) ............................................................ 3, 15, 27

*United We Stand Am., Inc. v. Internal Revenue Serv.,*
359 F.3d 595 (D.C. Cir. 2004) ........................................ 16, 31, 32, 33

**U.S. Constitution:**

U.S. Const. art. 2, § 3 ...................................................................... 5

**Statutes:**

Freedom of Information Act (FOIA):
  5 U.S.C. § 551(1) ................................................................ 4
  5 U.S.C. § 551(1)(A) ........................................................ 4
  5 U.S.C. § 552 ................................................................... 4
  5 U.S.C. § 552(a)(3) ........................................................ 4
  5 U.S.C. § 552(a)(4)(B) .................................................. 4
  5 U.S.C. § 552(b) ............................................................ 4
  5 U.S.C. § 552(b)(5) ..................................................... 4, 7

28 U.S.C. § 1291 ................................................................. 3

28 U.S.C. § 1331 ................................................................. 3

**Legislative Material:**

American Health Care Act of 2017,
  H.R. 1628, 115th Cong. (2017).......................................... 5

# GLOSSARY

| | |
|---|---|
| Committee | Committee on Ways and Means of the United States House of Representatives |
| FOIA | Freedom of Information Act |
| HHS | United States Department of Health and Human Services |
| IRS | Internal Revenue Service |
| OMB | Office of Management and Budget |

## INTRODUCTION

In 2017, Executive Branch personnel and congressional staffers engaged in a robust interbranch dialogue to implement the first Trump Administration's healthcare-reform priorities. That dialogue included many informal back-and-forth conversations that took place over email, some of which were initiated by the agencies and others of which were initiated by Congress.

In two such conversations—one initiated by an Office of Management and Budget (OMB) official; the other initiated with a message to a United States Department of Health and Human Services (HHS) employee—congressional staffers copied and pasted the same boilerplate legend into some (but not all) of the individual messages. That legend, which appeared only partway through each conversation and never at the beginning, does not merely assert congressional control over the email it accompanies. It also asserts control over "any related documents" produced by the Committee on Ways and Means of the United States House of Representatives (Committee). JA854 (quotation marks omitted). It even asserts control over "[a]ny . . . documents created or compiled by an agency in connection with any response to

this Committee document or any related Committee communications, including but not limited to any replies to the Committee." JA854-55 (quotation marks omitted). According to the legend, any document it covers "are not 'agency records' for purposes of the Freedom of Information Act [(FOIA)] or other law." JA855 (quotation marks omitted). The Committee argues that the entirety of any email exchange in which a single message contains this legend falls under the exclusive control of Congress and is therefore not subject to FOIA.

For decades, this Court has applied a straightforward legal test to assess whether documents sought under FOIA are controlled by Congress or an agency. That easily administrable framework, which draws bright lines for both the Executive Branch and Congress, compels the conclusion that the email exchanges are agency, not congressional records. The disputed records of interbranch conversations were not created by Congress alone, meaning that Congress could not unilaterally assert control over them in the middle of an ongoing exchange. And even if Congress could, the legend is too "generic and far-reaching" to "clearly manifest" the intent required by this Court's precedent. JA879-80. Moreover, the record confirms that the agencies

indisputably used their communications with Congress to serve Executive Branch purposes as the agencies saw fit, "in the legitimate conduct of [their] official duties." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 145 (1989); *see* JA882-86.

Because the district court correctly rejected the Committee's attempt to exclude agency documents from the scope of FOIA's disclosure requirements, the judgment should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiff American Oversight invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA21. The district court entered final judgment on September 30, 2025. JA889-90. The Committee timely appealed on October 23, 2025. JA891. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether five back-and-forth email exchanges between agency personnel and congressional staffers are placed beyond the reach of FOIA because congressional staffers attached a boilerplate legend to emails in the middle of each exchange.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Freedom of Information Act, 5 U.S.C. § 552, requires federal agencies to make certain documents available to a member of the public upon request.  *Id.* § 552(a)(3).  An individual dissatisfied with the agency's response may file suit in district court to compel "the production of any agency records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

FOIA does not directly define the term "agency records."  But the statute does define the term "agency."  *See* 5 U.S.C. § 551(1).  That definition specifically states that the term "does not include . . . the Congress."  *See id.* § 551(1)(A).  Even if a document qualifies as an agency record subject to FOIA, the statute does not require disclosure of "matters" falling within any of nine listed exemptions.  *Id.* § 552(b).  One of these, known as Exemption 5, applies to documents that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  *Id.* § 552(b)(5).

4

## B. Factual Background

The Constitution vests the President with various authorities "related to the enactment of legislation," JA105, including the authority to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," U.S. Const. art. 2, § 3. To aid the President's exercise of these authorities, Executive Branch agencies "work with their Congressional counterparts to develop legislation that is consistent with the Administration's policies and agenda." JA105-06. Indeed, "a substantial proportion of legislation introduced in Congress may originate in the Executive Branch on behalf of the President." JA106. Such work "includes developing substantive legislative proposals, negotiating legislative compromises, and assisting Congress' efforts to craft technically sound legislation—all of which are done to further Presidential policies and agendas." JA106.

In 2017, the first Trump Administration "prioritized healthcare reform as part of [the Administration's] legislative agenda." JA106. One focus of this effort was a proposed bill known as the American Health Care Act of 2017, H.R. 1628, 115th Cong., which was introduced in the House of Representatives in March 2017. JA078, JA105. An

amended version of that bill passed the House approximately two months later.  JA106.

In the run-up to the bill's introduction and during the bill's consideration in the House, various officials in OMB and HHS communicated with members of Congress and their staff who "shared the common goal of enacting" health care legislation.  JA106, JA204.  As officials at those agencies later explained in declarations, these communications included many email exchanges that furthered Executive Branch interests.  *See infra* pp. 26-28.

Shortly after the American Health Care Act was introduced in the House, plaintiff American Oversight submitted FOIA requests to OMB and HHS.  JA852.  As relevant here, the requests sought all communications "relating to health care reform" between OMB and HHS personnel and "members of Congress or congressional staff" made within a certain date range.  JA852 (quotation marks omitted).  Before the agencies had finished processing those requests, American Oversight sued the agencies under FOIA in district court.  The court issued a rolling production schedule requiring the agencies to process and produce thousands of pages of documents between June and

September of 2017.  JA852.  The agencies eventually produced over 950 responsive records spanning over 7,700 pages.  *See* JA852.  Portions of those records were redacted under FOIA Exemption 5, which applies to certain "inter-agency or intra-agency" documents.  JA853; *see* 5 U.S.C. § 552(b)(5).

During this process, the agencies produced four email exchanges (and various documents attached to certain emails) between agency personnel and Committee staffers.  One exchange is a conversation between an OMB official and a Committee staffer about healthcare reform options.  JA756.  The conversation was initiated by the OMB official.  JA756.  The remaining three exchanges contain slightly different versions of the same email conversation between Committee staffers and an HHS employee.  JA799-801, JA803-06, JA808-15; *see* JA199, JA751.

All four email exchanges contain at least one email from a Committee staffer that includes an identical boilerplate legend.  The legend reads:

> This document and any related documents, notes, draft and final legislation, recommendations, reports, or other materials generated by the Members or staff of the Committee on Ways and Means are records of the

> Committee, remain subject to the Committee's control, and are entrusted to your agency only for use in handling this matter. Any such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communications, including but not limited to any replies to the Committee, are also records of the Committee and remain subject to the Committee's control. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act or other law.

JA854-55 (quotation marks omitted). According to the Committee, this legend was not automatically generated; "[r]ather, the Committee . . . authorized staffers to include the footer when deemed appropriate, and they manually pasted the Legend into emails to do so." JA855 (quotation marks omitted). The legend does not appear until partway through each exchange, even in the conversation that was not initiated by agency personnel. JA756, JA800, JA805, JA809.

## C. Prior Proceedings

After the agencies produced a redacted version of these four email exchanges to American Oversight, the Committee moved to intervene in the proceeding to argue that the exchanges are congressional records not subject to FOIA. JA857-58. The district court referred the matter to a magistrate judge, who recommended (among other things) that the court treat the email exchanges as congressional records. JA659-664.

The district court entered summary judgment in favor of the agencies on a different ground: that nearly all the redactions were proper under FOIA Exemption 5. JA748-49. The court did not decide whether the disputed email exchanges are congressional records. On appeal, this Court reversed the district court's judgment, holding that FOIA Exemption 5 did not apply to the records at issue and that HHS's search was inadequate. *American Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 925 (D.C. Cir. 2024). The Court likewise expressed no view on the congressional records issue. *Id.* at 919 n.3.

On remand, the agencies reprocessed documents consistent with this Court's decision, lifting prior redactions that the agencies had made under Exemption 5. During this reprocessing, HHS discovered a fifth email exchange containing the boilerplate legend. JA853 n.4. The exchange was "similar to the [three] other HHS email chains but included one additional email" from an HHS employee. *Id.*; *see* JA816-17 (describing new exchange). The parties stipulated that the district court's decision on remand would apply to the newly discovered exchange. JA853-54 n.4. The parties further agreed that the agencies

9

would not release the disputed email exchanges during the pendency of this litigation.

### D.    The Decision On Review

The district court entered summary judgment in favor of American Oversight.  As the court observed, the key question in this case is whether Congress controlled the email exchanges when the FOIA request was made.  To answer that question, the court considered the two factors identified in this Court's precedent as decisive when "'special policy considerations . . . counsel in favor of according due deference' to a governmental entity not subject to FOIA."  JA865 (alteration in original).  The court concluded that both factors demonstrate that Congress did not control the email exchanges at issue.

With respect to the first factor—whether Congress manifested an intent to retain control over the specific email exchanges—the court explained that the "non-specific" and "generally applicable disclaimer" that congressional staffers  "affixed . . . to email communications . . . in the course of discussing proposed legislation about health care reform . . . does not reflect the considered judgment that has previously been held to manifest Congress's clear intent."  JA871.  "[I]f congressional

staffers could simply insert" a boilerplate legend "into any email correspondence" with Executive Branch officials, "the window of exclusion from FOIA" would "widen[ ] beyond a point that [this Court]'s careful analyses have previously allowed." JA881. With respect to the second factor—the extent of the agencies' ability to use and dispose of the records—the court cited undisputed evidence proving that the "Agencies clearly used the documents as they saw fit." JA882.

The district court specifically rejected the Committee's argument that the second factor should play no role in the analysis. JA882-86. That argument, the court explained, "cannot be squared with [this Court's] precedent." JA884. Nor does it make sense. Because "the Agencies' use of the documents is indicative of whether Congress or the Agencies manifested control," evidence of such use "is plainly relevant to the Court's analysis." JA884.

Having concluded that the email exchanges are subject to the agencies' control and are therefore agency records subject to FOIA under the two-factor test, the district court entered summary judgment in favor of American Oversight without reaching American Oversight's

alternative argument that the consideration of additional factors would be appropriate.  JA869, JA887.

## SUMMARY OF ARGUMENT

The district court correctly concluded that the disputed documents—five back-and-forth email exchanges that capture two conversations between agency personnel and congressional staffers—are not congressional records beyond the reach of FOIA.

To determine if a given document is controlled by Congress or an agency, this Court examines two factors:  the intent of the document's creator and the extent to which the agency is free to use and dispose of the document.  *American Civil Liberties Union v. Central Intel. Agency (ACLU)*, 823 F.3d 655, 663 (D.C. Cir. 2016).  Here, both factors militate against the Committee's assertion of control.  The disputed emails were sent in the context of an extensive interbranch dialogue between Executive Branch and congressional personnel.  No evidence in the record remotely suggests any shared understanding that all emails— even those written by agency personnel—would be subject to the exclusive control of Congress.  And the agencies indisputably used the emails as they saw fit.

That congressional staffers copy-pasted a boilerplate legend into emails sent partway through each conversation does not alter this conclusion. This belated, one-sided assertion of congressional control does not bind the Executive Branch. Moreover, the legend's generic terms are not specifically tailored to the specific emails they accompanied, much less to the broad array of related congressional and agency documents that the legend purports to cover. The legend does not even supply sufficiently specific instructions to govern covered documents. The legend is therefore too "general and sweeping" to support Congress's assertion of control. *Paisley v. Central Intel. Agency*, 712 F.2d 686, 695 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) (per curiam).

The Committee's counterarguments lack merit. At the outset, the Committee urges this Court to place a thumb on the scale in favor of finding congressional control. But the principal cases cited by the Committee all involve documents initially created and controlled by Congress that Congress later shared with the Executive Branch subject to certain conditions. Here, by contrast, the disputed documents embody informal two-way conversations involving emails written by

13

members of both Branches that occurred as part of extensive interbranch consultations.  That context also highlights the error in the Committee's invitation to ignore all evidence of how the agencies used their email communications with Congress—an invitation that cannot be reconciled with this Court's longstanding test for congressional control.  This Court's cases applying that test confirm that the mere application of this legend failed to convert these two-party conversations into records under Congress's exclusive control.

Finally, the Committee is mistaken in its contention that the district court's judgment raises separation-of-powers concerns.  The court correctly applied the legal framework that this Court adopted specifically to address such concerns.  And the court rightly rejected the unilateral efforts of one branch to assert exclusive control over the documents and activities of another.

## STANDARD OF REVIEW

This Court reviews the district court's order granting summary judgment de novo.  *Cause of Action Inst. v. Office of Mgmt. & Budget*, 10 F.4th 849, 855 (D.C. Cir. 2021).

14

## ARGUMENT

## THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE DISPUTED BACK-AND-FORTH EMAIL EXCHANGES BETWEEN AGENCY PERSONNEL AND CONGRESSIONAL STAFFERS ARE AGENCY RECORDS SUBJECT TO FOIA.

In *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), the Supreme Court held that two requirements must be satisfied for materials requested under FOIA to qualify as "agency records." First, the agency must have either created or obtained the requested materials. *Id.* at 144. Second, "the agency must be in control of the requested materials at the time the FOIA request is made." *Id.* at 145. The first requirement is clearly satisfied here. The case therefore turns on a single question: whether the agency controls the requested email threads. As the district court correctly explained, the answer to that question is yes.

### A. Whether the Email Exchanges Are Subject to FOIA Turns on the Intent of the Creators and Whether the Agencies Can Use and Dispose of Their Copies.

This Court examines four factors to determine whether an agency has sufficient control over requested documents to make them agency records for purposes of FOIA. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013). These factors are:

[1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Id.* (alterations in original) (quoting *Tax Analysts v. U.S. Dep't of Just.*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)).

But "there are 'special policy considerations' at stake" when Congress—"a governmental entity not covered by FOIA"—is involved in the creation of the documents. *Judicial Watch*, 726 F.3d at 221. For example, "Congress has undoubted authority to keep its records secret, authority rooted in the Constitution, longstanding practice, and current congressional rules." *Goland v. Central Intel. Agency*, 607 F.2d 339, 346 (D.C. Cir. 1978) (per curiam) (footnotes omitted). Construing FOIA to "requir[e] the disclosure of documents or information generated by Congress itself" would raise "separation-of-powers concerns." *Judicial Watch*, 726 F.3d at 225-26.

Because "the connection between Congress and the requested records implicates considerations not at issue" in ordinary FOIA cases, *United We Stand Am., Inc. v. Internal Revenue Serv.*, 359 F.3d 595, 599 (D.C. Cir. 2004), this Court has for decades applied "a somewhat

different control test" in the context of records that may be subject to congressional control, *Judicial Watch*, 726 F.3d at 221. In this context, "the first two factors" of the general four-factor test—that is, the intent of the document's creator and the ability of the agency to use the document as it sees fit—become "effectively dispositive." *See ACLU*, 823 F.3d 655, 663 (D.C. Cir. 2016) (quotation marks omitted).[1] This modified inquiry creates an "easily administrable bright-line rule" (Br. 11) for resolving whether records sought under FOIA are agency or congressional records. *Cf. Judicial Watch*, 726 F.3d at 220-24, 231 (resolving the status of records containing information from the Office

---

[1] The district court correctly recognized that, in this case, whether the modified or standard control test applies makes no practical difference to the result. JA869. As explained below, *infra* pp. 18-29, the modified control test conclusively establishes that the email exchanges at issue are agency records subject to FOIA. The remaining factors of the standard control test—the "extent to which agency personnel have read or relied upon" a document and "the degree to which the document was integrated into the agency's record system or files," *Judicial Watch*, 726 F.3d at 218 (quoting *Tax Analysts*, 845 F.2d at 1069)—overlap to some extent with the agencies' ability to use and dispose of the documents as they see fit. And here, consideration of those factors only reinforces that the email exchanges are subject to the agencies' control. But because application of the modified control test is consistent with this Court's longstanding precedent and because the Committee's appeal fails on the ground that it advances, the Court need consider only the modified test.

of the President under the two-factor "modified control test" rather than the more "indeterminate" four-factor inquiry).

## B. The Applicable Test Confirms that Congress Does Not Control the Email Exchanges.

The district court correctly concluded that, under both prongs of the two-factor test, the back-and-forth email exchanges at issue are not controlled by Congress.

### 1. There is no clearly expressed intent for Congress to control the email exchanges.

This Court has cautioned that, when applying the two-factor test, assertions of congressional control must be carefully scrutinized. *Paisley v. Central Intel. Agency*, 712 F.2d 686, 694 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) (per curiam). "[G]eneral and sweeping" assertions of congressional control do not "provide sufficient proof" of the "requisite express indication of a congressional intent to maintain exclusive control." *Id.* at 695. Rather, congressional intent must be expressed through "*contemporaneous* and *specific* instructions from [Congress] to the agencies." *Id.* at 694 (emphasis in original). Congress "may manifest an intent to retain control over documents *either* when the documents are created *or* when

the documents are transmitted to an agency." *ACLU*, 823 F.3d at 664 (emphasis in original); *see also id.* at 666 (noting that a preexisting agreement can establish intent existing at the time of a document's creation). But for Congress to "retain" control, it must act while the documents are within its control so that the agency has clear notice of the rules and can agree to be bound by them. *See, e.g., Holy Spirit Ass'n for the Unification of World Christianity v. Central Intel. Agency*, 636 F.2d 838, 843 (D.C. Cir. 1980) (explaining that a "post hoc letter from the Clerk of the House" is "insufficient evidence of Congress' intent to retain control" over documents previously transmitted); *cf. Paisley*, 712 F.2d at 695 (rejecting reliance on "post hoc" and "one-sided correspondence" when assessing congressional assertions of control (emphasis omitted)).

The most salient feature of the email exchanges at issue is that they were not created exclusively by Congress. Rather, they were two-way conversations between Congress and the Executive Branch, where some emails in each chain were written by congressional staffers and others were written by agency personnel. Indeed, one of the two conversations reflected in the disputed exchanges was initiated by an

OMB official.  JA756.  And the emails in each chain are iterative parts of the same conversation.  Thus, when inquiring into the intent of the emails' creators, it is necessary to ask whether the Congress and the agencies had a shared intent that the emails would be subject to the exclusive control of Congress.  There is no evidence of such a shared intent in the record, and the Committee does not argue otherwise.

This point is underscored by the context in which the email exchanges occurred.  These conversations were not isolated, one-off events.  They occurred during a robust interbranch dialogue in which "each side had an independent stake in the potential healthcare reform legislation under discussion." *American Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 920 (D.C. Cir. 2024).  That dialogue was lengthy and extensive, as evinced by the fact that the agencies produced over 950 records spanning over 7,700 pages in response to American Oversight's FOIA requests for "[a]ll communications" between the agencies and Congress "relating to health care reform" during the relevant period.  JA852 (quotation marks omitted).  The dialogue was also informal and fast-moving.  As one agency declarant explained, the use of email "allowed for full and frank

exchanges of ideas between the Executive and Legislative Branches in real time, as policy options were thoroughly explored and legislation developed"; allowed the agencies to "receive information about the legislative process quickly"; and enabled the agencies "to provide prompt and sound analysis and recommendations to inform the Administration's policies and positions." JA112.

As this context makes clear, the disputed email conversations bear no resemblance to documents this Court has treated as congressional records in prior cases, such as the congressionally created hearing transcript at issue in *Goland*, 607 F.2d at 347-48, or the congressionally drafted investigative reports at issue in *ACLU*, 823 F.3d at 658-59. Those documents were discrete records originally created by Congress and shared with the Executive Branch under specific restrictions prohibiting public distribution. The Court justifiably concluded that such documents were controlled by Congress and that the Executive Branch was holding them in trust. Here, by contrast, the context of these back-and-forth email conversations does not suggest that Congress originally owned all of the emails and that HHS and OMB were simply holding the emails on Congress's behalf—particularly when

21

Congress did not author or control many of those emails in the first place. It is difficult to see how Congress can "retain control," *ACLU*, 823 F.3d at 664, over a mutual, back-and-forth conversation that it never had exclusive control over to begin with.

As the district court further explained, JA879-80, the boilerplate legend that congressional staffers copy-pasted into some but not all of the emails in each exchange does not establish congressional control over the documents. At the outset, that legend was introduced to each conversation midstream. JA756, JA800, JA805, JA809. Just as a source cannot unilaterally go "off-the-record" mid-interview without the agreement of the reporter, the Committee cannot unilaterally assert control over all interbranch communications partway through a conversation without the agreement of the Executive Branch. *See ACLU*, 823 F.3d at 664 (explaining that congressional intent can be controlling "if Congress *initiates* the creation of documents with a clear statement," but rejecting the relevance of a "post-hoc objection to disclosure" (emphasis added) (alteration and quotation marks omitted)). That "the Agencies never objected to the Committee's assertion of control . . . while the relevant emails were being exchanged," Br. 45,

22

does not alter this conclusion.  The agencies owed no response to boilerplate text added below a signature in an email several messages into a conversation.

Even if the timing of the legend's appearance were not decisive, the legend's "generic" and "far-reaching" terms are not "specifically tailored" even to the emails that were written by congressional staffers themselves.  JA879-80.  The record contains no evidence that the Committee "specific[ally] determin[ed]" that the particular emails bearing the legend "should be subject to congressional control."  JA879.  Moreover, the use of the same boilerplate to assert control over emails with differing content suggests that the Committee was not applying any criterion for reserving control that was particularized to what each email said.  The record shows only that "Committee staffers . . . 'copied and pasted' the Legend" into some but not all of the emails they sent to "Agency staff about possible healthcare reform."  JA879 (alterations and citation omitted) (quoting JA752).

To make matters worse, the legend purportedly covers not only the specific emails to which it was appended, but also any "related"

document authored by Congress.  JA854.  Yet the legend nowhere specifies what constitutes a "related" document.

And the Committee did not stop there.  The legend even purports to exert control over "any" documents the agencies might produce in "repl[y] to the Committee," as well as over "[a]ny . . . documents created or compiled by an agency *in connection with* any response" to an email containing the legend and "any related Committee communications."  JA854-55 (emphasis added) (quotation marks omitted).  Although the legend never says how strong such a "connection" must be, its terms are broad enough to encompass even a memorandum drafted for the President by an OMB or HHS official pertaining to healthcare reform efforts in spring 2017.  That assertion of control is as indeterminate as it is implausible.

Compounding the problems caused by the legend's overbreadth, the legend fails to supply "*specific* instructions" governing use or disclosure.  *Paisley*, 712 F.2d at 694 (emphasis in original).  For example, the legend provides that the agencies may not use any covered document—even documents generated by the agencies themselves— except to "handl[e] this matter."  JA854 (quotation marks omitted).  Yet

the legend does not define the matter in question, leaving the agencies to guess at the situations in which Congress might have intended covered documents to be used. Nor does the legend specify what the "handling" of the "matter" may entail. The legend does not even appear to prohibit the agencies from sharing the emails—or information derived from those emails—with non-congressional third parties or the general public.

The Court's decision in *Paisley* confirms the shortcomings of the legend here. That case concerned certain documents created by a congressional committee and transmitted to two federal agencies during a congressional investigation. *Paisley*, 712 F.2d at 694. As evidence of Congress's intent to retain control over those documents, the government identified four letters written by the Committee that "indicate[d] the Committee's desire to prevent release without its approval of any documents generated by the Committee or by an intelligence agency in response to a Committee inquiry." *Id.* at 695. But the Court held that the letters failed to "manifest[] a clear congressional intent to maintain control" over the documents at issue because they were "too general and sweeping." *Id.* at 694-95. In

particular, the Court emphasized that the letters offered no "particular criteria by which to evaluate and limit the breadth of [their] interdiction." *Id.* at 695. The generic letters discussed in *Paisley* are not meaningfully distinguishable from the boilerplate legend here, which congressional staffers copy-pasted into different emails for no reason specific to the content of each document.

### 2. The agencies indisputably used the email exchanges to serve Executive Branch interests as they saw fit.

In assessing the second prong of the two-factor test, the Court "examine[s] how the agency would treat the records in its normal course of operations, in the absence of pending FOIA–related litigation." *Judicial Watch*, 726 F.3d at 219. This inquiry weighs against a finding of congressional control as well.

As the district court emphasized, "neither OMB nor HHS agreed to the terms of the Legend while exchanging emails with the committee staffers." JA883. And the record shows that the agencies did not understand Committee staffers' inclusion of a boilerplate legend on a few isolated emails partway through an ongoing conversation to preclude the agencies from using their communications with Congress

26

as they saw fit.  JA882.  Indeed, the agencies repeatedly used their communications with Congress to serve a variety of Executive Branch interests "in the legitimate conduct of [their] official duties." *Tax Analysts*, 492 U.S. at 145.

The record establishes, for example, that OMB used its email exchanges with Congress to obtain draft legislative language and draft communication strategies, which were used to aid OMB in "provid[ing] the President with analysis and recommendations" about "health care reform legislation, which would inform his decision on whether or not to sign or veto the legislation."  JA107-08.  OMB also relied on the exchanges to help prepare a formal public statement of the Executive Branch's position on the legislation, which would be used to emphasize the President's policy priorities and to convey nuanced positions on some complex issues raised.  JA108-09.  And OMB "solicited information from Congressional personnel" "throughout the drafting and debate process" and sought feedback from them about the wording and potential effect of proposed Administration policy statements. JA109.

The record further establishes that both OMB and HHS engaged in ongoing discussions with members of Congress and their staffers to provide Executive Branch comments on draft legislation and to propose legislative strategies that would achieve the Executive Branch's policy aims. JA110-12, JA203-04. These conversations enabled the Executive Branch to obtain up-to-date information about reform efforts and congressional reactions to administration policy proposals. JA110-12, JA203, JA206-07. Such information was used to prepare advice for the President; to aid HHS's planning for necessary operational changes at that agency if certain proposed legislation were to become law; to assist OMB and HHS in their communications with the media and external stakeholders; and to refine how the Executive Branch engaged with Congress. JA107-08, JA111-12, JA202-04, JA206-07.

This evidence—which the Committee failed to dispute in district court, JA882, and does not meaningfully dispute on appeal—proves that "the Agencies clearly used the [email exchanges] as they saw fit." JA882. Indeed, no evidence indicates that agency personnel ever thought it necessary to ask the Committee for permission to use any of the email exchanges—including the disputed exchanges at issue here—

for Executive Branch purposes.  The record thus undermines Congress's assertion of control over the disputed email exchanges.

### C.   The Committee's Contrary Arguments Lack Merit.

1.   On appeal, the Committee attempts to tilt the playing field in its favor by arguing that Congress need only prove a "clear intent" to control the email exchanges, while the agencies "carry a heavier burden" of demonstrating that they have "exclusive control of the disputed documents."  Br. 15-16 (emphasis and quotation marks omitted).  But the principal cases on which the Committee relies all involve documents initially created and controlled by Congress that Congress subsequently transferred to federal agencies subject to certain conditions.  *E.g.*, *Goland*, 607 F.2d at 347 (stenographic transcript of congressional hearing); *ACLU*, 823 F.3d at 658 (report authored by congressional committee).  In such circumstances, it made sense to ask whether Congress had "manifest[ed] an intent to retain control" over its own documents—thus maintaining the control that it already had—or whether Congress had surrendered its control to the agencies.  *ACLU*, 823 F.3d at 664.

Here, by contrast, the disputed email exchanges reflect informal, two-way conversations that were created by both Congress and the agencies and that occurred in the context of a broader interbranch dialogue. Accordingly, the question in this case is not whether the Congress evinced an intent to "*maintain* exclusive control of the documents" at issue, *ACLU*, 823 F.3d at 664 (emphasis added), but whether Congress *ousted* the agencies from their own pre-existing control over the same. As this Court observed in *Paisley*, "[w]hen Congress did not actually create and did not ever physically possess certain documents, it is difficult to imagine how such documents could be deemed within congressional control." 712 F.2d at 695.

The Committee's misapprehension of the nature of the email exchanges also explains the Committee's misapplication of the second prong of the two-factor test. As noted, the Committee does not contest that the agencies used their communications with Congress to serve Executive Branch purposes as they saw fit. JA882. The Committee simply urges this Court to ignore the second factor entirely, on the theory that, "when 'Congress has manifested its own intent to retain control, then the agency—by definition—cannot lawfully "control" the

documents.'" Br. 16 (quoting *Paisley*, 712 F.2d at 693); *see also id.* (arguing that the two factors "effectively merge into one when Congress clearly manifests its intent to control a document").

None of this Court's cases has embraced, and the Committee identifies no logical basis for adopting, a rule that control over a record created jointly by two Branches is settled by considering the conduct of only one. Indeed, even with respect to cases involving congressionally created records, the Committee's approach cannot be reconciled with decades of precedent holding that such evidence "is indicative of whether Congress or the Agencies manifested control" and examining such evidence in detail. JA884; *see* JA884-85 (listing cases). Consideration of the second factor is especially important where, as here, the Executive Branch disagrees with Congress's assertion of control. JA885.

**2.** The Committee relies (Br. 17-18, 24-25, 40) on *United We Stand*, 359 F.3d 595, to support its position that Congress can unilaterally assert control over documents created by Executive Branch agencies in addition to its own documents. But that case supports the agencies.

31

In *United We Stand*, the Joint Committee on Taxation sent a letter to IRS requesting certain information as part of a congressional investigation into audit procedures. 359 F.3d at 597. The letter stated that "[t]his document is a Congressional record and is entrusted to the Internal Revenue Service for your use only. This document may not be disclosed without the prior approval of the Joint Committee." *Id.* (quotation marks omitted). IRS responded with a letter and three attachments. *Id.*

The Court held that "portions of the IRS response that would effectively disclose that request" were subject to congressional control and beyond the reach of FOIA. *United We Stand*, 359 F.3d at 602. In reaching this conclusion, the Court "emphasize[d]" that it was relying on both the Joint Committee's letter *and* an IRS manual "expressly recogniz[ing] the confidentiality" of committee requests, *id.* at 605, which together provided evidence of a shared understanding by both sides. The Court's dictum that the Joint Committee on Taxation could "keep confidential not just 'this document' but also the IRS response" simply by broadening the terms of the letter must be understood in this context. Br. 25 (quoting *United We Stand*, 359 at 60l).

32

The Committee's reliance on *United We Stand* is further undercut by the Court's recognition that, because "neither Congress nor the [IRS] ha[d] exclusive control" over the portions of the IRS response that would *not* shed light on the Committee's letter—which the agency "created and maintain[ed] . . . in the course of its official duties"—those portions of the response were agency records subject to FOIA. 359 F.3d at 602, 604; *contra* Br. 14 (arguing that an "agency must establish that it *exclusively controlled* the transmitted records at the time it received the relevant FOIA request"). To reiterate, the email exchanges at issue—one of which was even initiated by an agency employee and not a Committee staffer—occurred as part of a broader interbranch dialogue where there is no evidence of any shared understanding that Congress would control the conversation to the exclusion of the Executive Branch.

3. The Committee contends that the boilerplate legend is sufficient evidence of its intent to control the disputed email exchanges because the legend was attached to specific emails in each exchange and because the legend states (among other things) that "[t]his document" is a congressional record. Br. 22-23, 26, 39-40 (quotation marks omitted). But neither feature lends the necessary specificity to the Committee's

asserters of control. That is because the legend asserts control not only over the emails containing the legend but also over any "related" congressional document, thus covering even emails that predate the insertion of the legend into a given conversation (as the Committee acknowledges, Br. 26-27).

The legend's assertion of retroactive control contradicts the Committee's argument (Br. 27. n.8) that its "staff made individualized decisions to exert control" over particular emails. It is difficult to ascribe specific intentionality to the act of "manually affixing the legend to the email" if, as the Committee states, the legend applies even to emails that do not include it. Br. 26, 27 n.8. Indeed, accepting the Committee's reasoning would allow a congressional staffer to convert any email exchange with the Executive Branch into a record controlled by Congress simply by adding the legend to the last email in the thread—notwithstanding the fact that every other email had been exchanged without any understanding or indication that the legend might apply. That conclusion does not make sense.

This Court rejected a similarly overbroad assertion of control in *Paisley*. In that case, the government relied on letters that expressly

set forth Congress's desire to control "any documents generated by the [Senate Select Committee on Intelligence] or by an intelligence agency in response to a Committee inquiry." *Paisley*, 712 F.2d at 695 n.38. Yet the Court concluded that those letters were "too general and sweeping" to demonstrate "a specific intent" to govern the particular documents at issue, notwithstanding the fact that the documents at issue fell comfortably within the letters' assertion of control. *Id.* at 695.

Reinforcing that conclusion further, the legend—like the letters in *Paisley*—asserts control over a vast swath of documents produced by the agencies. *Compare* JA855 (extending legend to any "documents *created or compiled* by an agency in connection with any response to this Committee document *or any related Committee communications*") (emphases added) (quotation marks omitted), *with Paisley*, 712 F.2d at 695 (noting that letters covered "any documents generated by . . . an intelligence agency in response to a Committee inquiry"); *see supra* p. 24. In *Paisley*, the Court sensibly declined to "exempt from FOIA's purview a broad array of materials otherwise clearly categorizable as agency records." 712 F.2d at 696; *see id.* (noting that "[m]any

agencies . . . must work frequently and closely with congressional committees on matters of budget and policy").

The Court should follow the same course here.  As the district court concluded, "[d]ue deference" for Congress "does not require such an approach."  JA881.  "On the contrary, respect for the separation of powers and the purpose of [FOIA] mandate its rejection."  JA881.  Accepting the Committee's arguments would stretch "the window of exclusion from FOIA . . . beyond a point that [this Court's] careful analyses . . . allow[]."  JA881.

4.    The Committee next contends that the district court imposed untenable preconditions on Congress's ability to assert control over records.  The Committee argues (Br. 32-34, 52), for example, that the district court improperly emphasized the fact that the disputed email exchanges arose outside the context of a formal investigation.  But the court's inquiry into the "circumstances attending [the emails'] creation" and "the [circumstances] under which [they were] transferred to the agenc[ies]" was consistent with—and indeed compelled by—the two-factor test.  *Paisley*, 712 F.2d at 692; *see, e.g.*, *ACLU*, 823 F.3d at 664.  The district court expressly rejected the idea that Congress may only

exert control over documents created when exercising its investigative and oversight functions, and this Court need not draw any distinction between congressional activities to affirm its judgment. JA873.

The Committee also criticizes (Br. 34-39, 46-49, 52) the district court for inquiring into the extent of congressional staffers' authority to copy-paste the legend into emails. But the court did not conclude that only "a sufficiently senior [Committee] official" may assert Congress's control over a document. Br. 47. Nor did the court restrict Congress's ability to "order[] its internal affairs" in any way. *Id.* The court did observe that the record lacked "details about how the staffers purportedly manifested Congress's intent." JA878. But the key to its judgment was the conclusion that the presence of the legend on a handful of emails failed to show that Congress "made a specific determination that" the email exchanges "should be subject to congressional control," JA879—not least because the legend was too "generic" and "far-reaching," JA879.

**5.** Finally, the Committee argues (Br. 50-52) that requiring disclosure of the disputed email exchanges would raise serious separation-of-powers concerns given "Congress's decision to exclude

itself from FOIA." Br. 51. But those principles are vindicated—not violated—by the district court's faithful application of this Court's longstanding two-factor test. The Court developed that test to address these very concerns. *Supra* pp. 15-18. And for nearly five decades, the Court has deployed that test both to accept and to reject assertions of congressional control.

Moreover, the Committee's unilateral assertion of control over Executive Branch emails raises separation-of-powers concerns of its own. Although the Committee is only invoking the legend with respect to the disputed email exchanges, the legend itself—and the Committee's arguments urging this Court to give the legend controlling weight—has no such limit. For example, if the agencies had drafted healthcare reform bills for the President to unveil as part of his legislative agenda, the legend would appear to give the Committee veto power over their use simply because they were "compiled . . . in connection with any response" to an email with the legend on it or any "related" document. JA854-55 (quotation marks omitted). And if the agencies had reason to investigate the conduct of the personnel who worked on healthcare reform in 2017, the legend's plain text would appear to bar the agencies

from examining their own employees' emails without first seeking permission from Congress.

In the end, "whatever encroachment upon congressional authority [the Court] might engender by applying FOIA" to an interbranch dialogue over policy proposals, "it was Congress that passed the Act and Congress that can amend it." *Judicial Watch*, 726 F.3d at 224.

## CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM

*/s/ Michael Shih*

MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

May 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,246 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

_/s/ Michael Shih_

MICHAEL SHIH

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Michael Shih*
MICHAEL SHIH