No. 25-5375

# United States Court of Appeals for the District of Columbia Circuit

AMERICAN OVERSIGHT,
*Plaintiff-Appellee,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,
*Defendants-Appellees,*

COMMITTEE ON WAYS AND MEANS OF THE U.S. HOUSE OF
REPRESENTATIVES,
*Defendant-Intervenor-Appellant.*

On Appeal from the United States District Court for the District of
Columbia, Case No. 17-827
The Hon. Emmet G. Sullivan

## BRIEF FOR APPELLEE AMERICAN OVERSIGHT

Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 919-6303

May 11, 2026

*Counsel for Plaintiff-Appellee*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies the following:

## A. Parties and Amici

Plaintiff in the district court, and appellee here, is American Oversight. Appellant here is the Committee on Ways and Means of the U.S. House of Representatives, which intervened on behalf of Defendants the United States Department of Health and Human Services and the Office of Management and Budget in the district court (here, also appellees). There were no other parties, intervenors, or amici before the district court, and no intervenors or amici have appeared in this Court to date.

## B. Ruling Under Review

Appellant seeks review of the September 24, 2025 Memorandum Opinion and September 24, 2025 Order issued by the Honorable Emmet G. Sullivan in *American Oversight* v. *U.S. Department of Health & Human Services, et al.*, Case No. 17-827 (D.D.C.), granting Plaintiff-Appellee American Oversight's cross motion for summary judgment and

denying Defendant-Intervenor-Appellant's motion for summary judgment, and the September 30, 2025 Order entering final judgment.

## C.    Related Cases

This case has previously come before this Court upon appeal by Plaintiff-Appellee American Oversight from an earlier ruling in the district court. *See Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909 (D.C. Cir. 2024) (22-5281). Counsel for American Oversight are not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

Date:  May 11, 2026          Respectfully submitted,

/s/ *Emma Lewis*
Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 919-6303
emma.lewis@americanoversight.org
katherine.anthony@americanoversight.org

*Counsel for Plaintiff-Appellee*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellee American Oversight certifies that it does not have parent corporations, and that no publicly held corporation has a 10% or greater ownership interest in either entity.

Date:  May 11, 2026          Respectfully submitted,

/s/ Emma Lewis

Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 919-6303
emma.lewis@americanoversight.org
katherine.anthony@americanoversight.org

*Counsel for Plaintiff-Appellee*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellee American Oversight respectfully requests oral argument in this case. This case presents the question of whether Congress can unilaterally bind the Executive Branch, without the Executive Branch's understanding or agreement, to prevent it from releasing records in an agency's possession under the Freedom of Information Act. Because this issue is likely to reoccur, oral argument would aid the Court in rendering its decision.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................... viii

GLOSSARY ...................................................................................... xiii

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ........................................................ 4

STATEMENT OF THE ISSUES ............................................................ 4

PERTINENT STATUTES.................................................................... 5

STATEMENT OF THE CASE ............................................................... 6

A.  STATUTORY BACKGROUND ....................................................... 6

B.  PROCEDURAL HISTORY .............................................................. 7

SUMMARY OF ARGUMENT................................................................ 13

STANDARD OF REVIEW ................................................................... 14

ARGUMENT...................................................................................... 15

I.  CONGRESS DID NOT CLEARLY MANIFEST INTENT TO CONTROL THE CONTESTED RECORDS, AND SO THEY ARE AGENCY RECORDS UNDER EVEN THE COMMITTEE'S NOVEL TEST. .................................................. 15

    A.  All agency records, including the records in this case, fulfill two requirements: the Agency both created or obtained them and controlled them. .......... 18

    B.  This Circuit's precedent establishes multiple considerations that are relevant to manifesting clear intent to control. ................................................. 19

v

C. The appended language does not sufficiently manifest the Committee's intent to control the Contested Records under even the Committee's proposed one-factor test.................................................. 24

    1. The fact that the Committee was not engaging in oversight over the Agencies is relevant to the clarity of its expression of intent.................................................. 25

    2. A Committee staffer's unilateral conduct is insufficient to demonstrate Congress's intent.................................................. 27

    3. The Committee cannot demonstrate intent to control messages that precede emails containing the legend. ....................................... 322

        a. The Committee's post-hoc statements of intent are invalid. ............... 33

        b. The records must be analyzed as individual emails, not chain-by-chain, because intent must be specific to each document. ........................ 36

    4. The legend itself is not adequate nor sufficiently specific to manifest congressional intent to control the remaining Contested Records............................ 38

II. THE AGENCY'S ACTIONS HERE SHOW THAT CONGRESSIONAL MANIFESTATION OF INTENT WAS NOT EXPRESSED CLEARLY. .................................................. 42

    A. Under any test, the inquiry must go beyond congressional expression of intent to control to examine whether the Agency understood itself to be bound. .................................................. 43

B. The Agencies' ability to use and dispose of the records demonstrates that any congressional manifestation of intent was insufficiently clear. ........ 46

III. WHEN, AS HERE, CONGRESS'S OVERSIGHT FUNCTION IS NOT IMPLICATED, THE FULL FOUR-FACTOR *BURKA* TEST APPLIES AND WEIGHS IN FAVOR OF AGENCY CONTROL. ................................................ 48

A. No special policy considerations that would trigger the modified two-factor test are relevant here, as the Contested Records do not relate to oversight activities. ........................................ 49

B. Agency personnel read and relied on the Contested Records extensively. ................................... 54

C. The Contested Records were deeply integrated into the agencies' records systems. ........................... 56

IV. PRINCIPLES UNDERLYING THE SEPARATION OF POWERS DOCTRINE DEMONSTRATE WHY CLEAR AND SPECIFIC INTENT TO CONTROL IS REQUIRED TO REMOVE RECORDS FROM AGENCY CONTROL. ............... 58

CONCLUSION .................................................................... 62

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Am. C.L. Union v. C.I.A (ACLU II).,*
823 F.3d 655 (D.C. Cir. 2016)............................................................
...................2, 6, 18, 21, 22, 23, 28, 33, 34, 39, 40, 42, 44, 47, 49, 50, 51

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.,*
830 F.3d 667 (D.C. Cir. 2016)............................................................ 37

*Am. Oversight v. U.S. Dep't of Health & Hum. Servs.,*
101 F.4th 909 (D.C. Cir. 2024) ........................................................... 11

*Burka v. U.S. Dep't of Health & Hum. Servs.,*
87 F.3d 508 (D.C. Cir. 1996)................................. 7, 19, 46, 54, 55, 57, 62

*Cause of Action Inst. v. Off. of Mgmt. & Budget,*
10 F.4th 849 (D.C. Cir. 2021) ............................................................ 55

*Cause of Action v. Nat'l Archives & Recs. Admin.,*
753 F.3d 210 (D.C. Cir. 2014)........................... 22, 23, 44, 45, 51, 52, 54

*Cheney v. U.S. Dist. Court for D.C.,*
542 U.S. 367 (2004)....................................................................... 58

*Ctr. for Nat. Sec. Stud. v. C.I.A.,*
577 F. Supp. 584 (D.D.C. 1983)......................................................... 29

*Dep't of Air Force v. Rose,*
425 U.S. 352 (1976)......................................................................... 3

*Duncan v. Walker,*
533 U.S. 167 (2001)....................................................................... 45

_____

*Authorities upon which we chiefly rely are marked with asterisks.

*Exxon Corp. v. F.T.C.*,
  589 F.2d 582 (D.C. Cir. 1978)................................................................ 31

*\*Goland v. C.I.A.*,
  607 F.2d 339 (D.C. Cir. 1978).................................................................
  ...1, 2, 15, 20, 22, 23, 24, 29, 32, 33, 39, 41, 43, 46, 47, 50, 51, 52, 56, 59

*Gravel v. United States*,
  408 U.S. 606 (1972)....................................................................... 30

*Great Lakes Comnet, Inc. v. Fed. Commc'ns Comm'n*,
  823 F.3d 998 (D.C. Cir. 2016)................................................................ 45

*Holy Spirit Ass'n for the Unification of World Christianity v. C.I.A.*,
  636 F.2d 838 (D.C. Cir. 1980)........................... 16, 20, 21, 50, 51, 54, 59

*Hyatt v. U.S. Pat. & Trademark Off.*,
  346 F. Supp. 3d 141 (D.D.C. 2018)......................................................... 56

*Jud. Watch, Inc. v. Fed. Hous. Fin. Agency (Jud. Watch I)*,
  646 F.3d 924 (D.C. Cir. 2011)........................................................ 17, 55

*Jud. Watch, Inc.* v. *U.S. Dep't of Just.*,
  20 F.4th 49 (D.C. Cir. 2021) ............................................................... 14

*\*Jud. Watch, Inc. v. U.S. Secret Serv. (Jud. Watch II)*,
  726 F.3d 208 (D.C. Cir. 2011)............................... 21, 44, 46, 49, 50, 51

*McGehee v. C.I.A.*,
  697 F.2d 1095 (D.C. Cir. 1983)............................................................ 18

*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004).......................................................................... 3

*\*Paisley v. C.I.A.*,
  712 F.2d 686 (D.C. Cir. 1983)................................................................
  . ...................4, 16, 21, 22, 29, 33, 37, 38, 39, 40, 49, 50, 51, 52, 53, 59

*Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*,
  No. CV 13-0483 (ABJ), 2014 WL 12943216 (D.D.C. Mar. 25, 2014) ... 56

*Ryan v. Dep't of Just.*,
  617 F.2d 781 (D.C. Cir. 1980) ........................................................ 50, 52

*Shapiro v. C.I.A.*,
  247 F. Supp. 3d 53 (D.D.C. 2017) ......................................................... 37

*Tax Analysts v. U.S. Dep't of Justice (Tax Analysts I)*,
  845 F.2d 1060 (D.C. Cir. 1988) ........................................................ 7, 19

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ............................................................................. 58

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*,
  489 U.S. 749 (1989) .......................................................................... 3, 48

*U.S. Dep't of Just. v. Tax Analysts (Tax Analysts II)*,
  492 U.S. 136 (1989) .......................................................................... 6, 18

*United States v. AT&T Co.*,
  567 F.2d 121 (D.C. Cir. 1977) ............................................................. 26

*United States v. Nixon*,
  418 U.S. 683 (1974) ............................................................................. 58

*United We Stand Am. v. I.R.S.*,
  219 F. Supp. 2d 14 (D.D.C. 2002) .................................................. 18, 43

*\*United We Stand Am., Inc. v. I.R.S.*,
  359 F.3d 595 (D.C. Cir. 2004) ..............................................................
  ...................................18, 21, 23, 29, 31, 32, 33, 34, 37, 40, 47, 50, 51

*Watkins v. United States*,
  354 U.S. 178 (1957) ............................................................................. 30

*Wolfe v. Dep't of Health & Hum. Servs.*,
  711 F.2d 1077 (D.C. Cir. 1983) .......................................................... 57

**Statutes**

5 U.S.C. § 552 .......................................................................... 4, 5, 6

5 U.S.C. § 552(a) .......................................................................... 2

5 U.S.C. § 552(a)(4)(B).................................................................. 18

28 U.S.C. § 1291 .......................................................................... 4

28 U.S.C. § 1331 .......................................................................... 4

**Other Authorities**

112 Cong. Rec. 13647 ................................................................. 16
Application of Privacy Act,
  25 Op. O.L.C. 279 (2001) ....................................................... 31

Auth. of Ind. Members of Congress to Conduct Oversight of the
  Executive Branch,
  41 Op. O.L.C. 76 (2017) .................................................... 26, 31

*OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update*,
  U.S. Dep't of Justice (updated 1995)
  https://www.justice.gov/oip/blog/foia-update-oip-guidance-
  determining-scope-foia-request......................................... 37

Cong. Research Serv., *CRS Products from the Library of Congress*,
  https://www.congress.gov/crs-products (last accessed May 8, 2026)... 43

Benjamin M. Barczewski, Cong. Research Serv., The Freedom of
  Information Act (FOIA): A Legal Overview (June 27, 2024)
  https://www.congress.gov/crs-product/R46238#ifn488 ....................... 43

The Federalist No. 51 (J. Madison)
  (J. Cooke ed., 1961) ..................................................................... 58

# GLOSSARY

AO            American Oversight

FOIA          Freedom of Information Act

HHS          U.S. Department of Health and Human Services

JA             Joint Appendix

OMB         Office of Management and Budget

## INTRODUCTION

The Committee on Ways and Means of the U.S. House of Representatives seeks to bar two Executive Branch agencies from producing five email chains between agency and congressional staff—emails that the agencies affirm should be made public under the Freedom of Information Act. The Committee's theory is that *any* professed indication of congressional intent to control the documents, no matter the timing, specificity, or speaker, must necessarily transform all related records in the agency's possession into congressional records without any further inquiry into the agency's actions. This argument, as the district court concluded, is a novel position contradicting nearly half a century of D.C. Circuit precedent. JA868 ("[T]he Committee asks the Court to modify the [longstanding] test even further [. . .].") It is the Committee, not the district court, that seeks to "depart[] from this Court's precedent," Defendant-Intervenor-Appellant's Br. ("App. Br.") at 2, which has for decades required a court to look to "all of the facts of the case" to determine whether a document is *actually* under congressional or agency control. *Goland v. C.I.A.*, 607 F.2d 339, 347 (D.C. Cir. 1978). Under any test, the facts demonstrate that the records at issue here are agency

1

records, as the Committee failed to clearly manifest an intent to control them, and the agencies used, read, relied upon, and integrated the documents into their systems such that HHS and OMB identified and produced them as agency records in response to Plaintiff's FOIA request.

Practically since the FOIA went into effect—an act requiring federal agencies to make public "agency records," 5 U.S.C. § 552(a)—the D.C. Circuit has been continually called upon to decide whether a record originating in Congress but in the possession of an agency is an agency record subject to FOIA or a congressional record outside the reach of public disclosure. *See, e.g., Goland*, 607 F.2d at 344–48. In a long line of cases stretching across decades, courts have carefully considered not just Congress's words expressing intent to maintain control, but the individual conveying the words, the context in which the statement was made, and the actions of the receiving agency to determine the entity with actual control over the document. Where congressional intent to control is expressed in the oversight context, Congress is given some deference, but the agency's actions are always relevant to the analysis. *See Am. C.L. Union v. C.I.A. ("ACLU II")*, 823 F.3d 655, 663 (D.C. Cir. 2016).

The Committee now seeks to establish a new "bright-line rule," App. Br. at 11, that would substantially broaden the definition of congressional records. The Committee's novel proposed rule would allow even the most junior congressional staffer to append to any document nonspecific template language stating a broad intent to control an endless accumulation of additional records—including those created *before* any manifestation of intent to control—and bind a co-equal branch of government to obey that decision. This would contradict the basic purpose of FOIA, a statute enacted by Congress itself to "'open agency action to the light of public scrutiny,'" *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press,* 489 U.S. 749, 772 (1989) (quoting *Dep't of Air Force v. Rose,* 425 U.S. 352, 372 (1976)), which is "a structural necessity in a real democracy," *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004). Congress could have wholesale exempted every one of its communications from FOIA but did not, in recognition that most communications between the Executive Branch and Congress comprise the type of agency business to which the public deserves access. As the district court found, broadening the scope of congressional records as dramatically as the Committee asks this Court to do would "contravene

3

the D.C. Circuit's admonition that Congress's FOIA exemption cannot be interpreted to 'undermine the broad spirit of disclosure that animates [FOIA].'" JA887 (quoting *Paisley v. C.I.A.*, 712 F.2d 686, 696 (D.C. Cir. 1983)). This Court should decline the Committee's call and require the records to be released.

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331. That court entered its final judgment on September 30, 2025, JA889–90, and the Committee timely appealed on October 23, 2025, JA891–92. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the records at issue, consisting of emails between the U.S. House of Representatives Committee on Ways and Means and the U.S. Department of Health and Human Services and Office of Management and Budget, are agency records under the Freedom of Information Act, 5 U.S.C. § 552, as determined by the district court, because the Committee did not manifest sufficiently clear intent to control the records when a staff member copy-and-pasted a generally applicable, boilerplate disclaimer to their emails, nor did the agencies understand the records to be under congressional control.

# PERTINENT STATUTES

The relevant provisions of the Freedom of Information Act, 5 U.S.C. § 552, state:

(a)    Each agency shall make available to the public information as follows: . . .

(3)(A) . . . each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person. . . .

(f)    For purposes of this section, the term–

(1) "agency" as defined in section 551(1) of this title includes any executive department . . . or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes–

(A)   any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format . . .

## STATEMENT OF THE CASE

### A.   Statutory Background

The Freedom of Information Act, 5 U.S.C. § 552, generally requires federal agencies to make their records available to the public upon request. Agency records are those "that an agency (1) 'create[s] or obtain[s], and (2) control[s]. . . at the time the FOIA request is made.'" *ACLU II*, 823 F.3d at 662 (quoting *U.S. Dep't of Just. v. Tax Analysts* ("*Tax Analysts II*"), 492 U.S. 136, 144–45 (1989)). Control is determined by the so-called "*Burka* factors":

(1) the intent of the document's creator to retain or relinquish control over the records;
(2) the ability of the agency to use and dispose of the record as it sees fit;
(3) the extent to which agency personnel have read or relied upon the document; and
(4) the degree to which the document was integrated into the agency's record system or files.

*Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Tax Analysts v. U.S. Dep't of Justice* ("*Tax Analysts I*"), 845 F.2d 1060, 1069 (D.C. Cir. 1988)) (formatting modified).

## B. Procedural History

In March 2017, AO submitted virtually identical FOIA requests to HHS and OMB (together, Agencies) seeking communications between the Agencies and Congress related to health care reform legislation. *See* JA217–33. When neither Defendant responded to the requests, AO filed suit against them. JA021–53. The district court ordered Defendants to review and process responsive records on a rolling basis, completing production by September 5, 2017. JA852–53. Defendants' productions totaled 658 records from OMB and 5,384 pages of records from HHS, which were heavily redacted under FOIA Exemption 5. *See id.*

Defendants' September 5, 2017 production included four partially redacted email chains exchanged between HHS or OMB and individuals who work for the Committee. JA054–55. Some of the messages within these exchanges bore the following "legend":

> This document and any related documents, notes, draft and final legislation, recommendations, reports, or other materials generated by Members or staff of the Committee on Ways and Means are records of the Committee, remain

subject to the Committee's control, and are entrusted to your agency only for use in handling this matter. Any such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communications, including but not limited to any replies to the Committee, are also records of the Committee and remain subject to the Committee's control. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act or any other law.

*See* JA837–40 ¶¶ 4, 9, 10; JA755–815.

These Contested Records[1] consist of:

- Four email communications and three attachments within one email chain. The chain was initiated by Joseph Grogan, the Associate Director of Health Programs at OMB, to Emily Murry, then a "staff member of the Committee." JA844 ¶ 1; JA752 ¶ 9. In the first email, Mr. Grogan wrote, "Emily, could we speak today? I have a policy issue I need to run by you." JA756. The legend is not appended to any email until the fourth, where Ms. Murry states, "[h]ere are three documents

---

[1] The Committee refers to the documents at issue as the "Legended Documents," and considers each email chain to be a single document. App. Br. at 5. AO uses "Contested Records" to apply to each individual email record, some of which have the appended legend and some of which do not. This distinction is relevant to the Court's analysis, as discussed *infra*, Section I.C.3.b.

to help fill the 'white space.' I am happy to set up a call with the experts on my team to go through specific items / provide more information." *Id.*

- Seven email communications, as part of an email chain, involving Sarah Arbes, then an employee of HHS, and Stephanie Parks, then "a staff member of the Committee." JA845 ¶¶ 5, 6, 7; JA752 ¶ 9. These emails discussed state and federal health care plans. JA798–801. Ms. Parks sent two of the seven emails, both with the legend attached. *Id.*

- Nine email communications, as part of an email chain, involving Ms. Arbes and Ms. Parks. JA841 ¶ 19; JA802–06. This chain is identical to JA798–801, with the addition of two email communications from Adam Buckalew and Ms. Arbes' response to Mr. Buckalew.

- Five email communications and one unredacted attachment, as part of an email chain, involving Ms. Arbes and Ms. Parks. JA842 ¶ 21; JA807–10. This chain is identical to JA798–801, without the final two email communications in that email

chain between Ms. Arbes and Ms. Parks, and thus this email chain only contains one added legend.

The record contains no evidence of why this legend was appended to these specific emails. The Committee's declarant states that "staff members were authorized by the Committee to include the legend on official emails when deemed appropriate," JA752 ¶ 10, but the Committee has proffered no details on that authorization nor how it was applied to the Contested Records.

Shortly after these email chains were produced to AO, the Committee moved to intervene in the lawsuit to argue that they are congressional records not subject to FOIA. JA009. Following cross-motions for summary judgment by each party, JA009–11, Magistrate Judge Robinson issued a Report and Recommendation recommending that the Agencies' and the Committee's motions be granted and that AO's motion be denied. JA651–77. The Magistrate Judge reasoned that the legend was sufficient to "assert[] Congress's intent to retain control over the documents . . . ." JA664. The district court ultimately denied AO's motion for summary judgment as to the Committee, granted the Agencies' motion on the basis that the records could be withheld pursuant

to the so-called "consultant corollary" to FOIA Exemption 5, and dismissed the Committee's motion as moot. JA748–49. On appeal, this Court reversed that decision, holding that the consultant corollary did not apply, and so the redacted information could not be withheld under Exemption 5. *Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 912 (D.C. Cir. 2024). The D.C. Circuit "express[ed] no views on the merits" of the Committee's argument that the Contested Records are congressional records, *id.* at 919 n.3, but observed that the Agencies did not dispute that the emails are agency records subject to FOIA, *id.* at 919. Furthermore, this Court found that Congress and the Agencies had divergent and independent interests in the subject matter the agency and Committee staffers were discussing in the Contested Records, *id.* at 920–21, and reversed and remanded for further proceedings, *id.* at 925.

On remand, the Committee renewed its motion for summary judgment arguing that the first *Burka* factor was dispositive, JA018, and the Agencies agreed to withhold the Contested Records until the congressional records question is decided. HHS then "discovered an additional document that contains the Committee's legend." JA816. The newly-discovered document is described as "an additional version of the

11

[HHS] email chain" appearing in three of the Contested Records email chains, "with one new email message." *Id*. The new message is "an April 26, 2017 email from an HHS employee to Committee staff members." JA 817. It is not described as containing any additional legend. *See id.*

AO opposed the Committee's motion and cross-moved for summary judgement on the basis that the Committee did not demonstrate sufficient intent to control the Contested Records; the Agencies used the records as they saw fit; Agency personnel read and relied upon the documents; and the documents were integrated into the Agencies' records systems and files. JA019. The Agencies also opposed the Committee's motion, agreeing with AO that the Contested Records are agency records subject to FOIA. JA019.

The district court denied the Committee's motion and granted AO's cross-motion, holding that the Contested Records are agency records subject to FOIA. JA883–87. The district court rejected the Committee's proposed "further modif[ied]" test, which would "view only the first [*Burka*] factor as dispositive, without any consideration of how the agency viewed or used the document as relevant to [the court's] analysis." JA868. The court declined to resolve whether the four-factor *Burka* test

for agency records or a modified, two-factor version should determine the records' status, as it concluded that "American Oversight and the Agencies prevail under either test." JA869. In reviewing the first two *Burka* factors, the district court credited the context in which the records were created, the position of the employee expressing intent to control, the lack of specificity of the assertion, and the Agencies' actual use of the records in concluding that "the non-specific assertion does not reflect the considered judgment that has previously been held to manifest Congress's clear intent." JA871.

## SUMMARY OF ARGUMENT

The Committee fails under any congressional records test, whether their proposed single-factor test or those established by this Court, to demonstrate sufficient manifestation of intent to control their communications with HHS and OMB. In the decades-long line of cases establishing the test for whether a record is an agency or congressional record under FOIA, the D.C. Circuit has always looked to the context and facts beyond the four corners of the document itself. It is well-established that the Court's analysis is not limited to Congress's actions, but the agency's actions are equally important—not only relevant but *necessary*

13

to any determination of whether Congress clearly manifested intent to control a document. Congress did not choose to categorically exempt from FOIA records originating in the legislative branch but within Executive Branch agencies' possession. Instead, by default, such records are agency records unless Congress establishes its control over the documents. While Congress is granted some deference on this question for records created in the context of its oversight duties, the agencies' understanding and actions are always relevant to the analysis. The Committee's efforts to establish a novel, bright-line rule looking only to Congress's intent not only contradicts half a century of precedent but improperly weights one co-equal branch over another. Regardless, a staffer's unilateral appending of a template footer to certain emails in email chains discussing policy concerns with HHS and OMB staff is insufficient to clearly manifest Congress's intent to control the Contested Records under any test.

## STANDARD OF REVIEW

This Court reviews questions of law—including a district court's decision to grant summary judgment—*de novo. See Jud. Watch, Inc.* v. *U.S. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021).

14

## ARGUMENT

## I. CONGRESS DID NOT CLEARLY MANIFEST INTENT TO CONTROL THE CONTESTED RECORDS, AND SO THEY ARE AGENCY RECORDS UNDER EVEN THE COMMITTEE'S NOVEL TEST.

The Committee asks this Court to contradict decades of its own precedent and create a novel, bright-line rule that essentially grants Congress near limitless power to remove records in agencies' possession from public disclosure under FOIA. Its proposed test would examine only "whether there are objective indicia of Congress's manifest intent to control," App. Br. at 14, ignoring this Court's directive to look at "all the facts of a case" to ascertain the crucial question of which entity has actual control over a record. *Goland*, 607 F.2d at 347. On occasion, in the oversight context (not applicable here), special congressional interests mandate a more limited inquiry. *See* Section III.A, *infra.* But even that limited test is not so deferential as the Committee insists, where the inquiry would end if Congress offers just a generalized expression of intent to control, and even if that intent is expressed well after the record is created or even used by the agency. This standard has no support in precedent and blatantly disregards this Circuit's admonishment that the congressional records test should not be read to "undermin[e] the spirit

15

of broad disclosure that animates" FOIA. *Paisley*, 712 F.2d at 696. Nevertheless, even under the Committee's ungrounded and desiccated "one-factor" test, Congress did not sufficiently manifest control over the Contested Records to remove them from FOIA's reach.

Executive Branch communications with congressional actors are, by default, agency records subject to FOIA. The long history of this Circuit reviewing whether congressionally created records were agency records—and moreover, at times answering that question in the affirmative (*Paisley*, 712 F.2d at 696; *Holy Spirit Ass'n for the Unification of World Christianity v. C.I.A.*, 636 F.2d 838, 847 (D.C. Cir. 1980), *vacated in part*, 455 U.S. 997 (1982))—underscores the absurdity of the Committee's current claim that following this Circuit's precedent "would create an uncontemplated backdoor for the public to obtain Legislative Branch deliberations and documents shared with federal agencies." App. Br. at 13. If Congress communicates with an agency, the baseline assumption is that record is a record "of Federal Executive and regulatory agencies." App. Br. at 11 (quoting 112 Cong. Rec. 13647 (1966)). The mere appearance of a congressional actor on a

16

communication in the agency's possession does not magically transform that record into a congressional record.

As this Circuit has carefully considered over decades, a record originating with Congress but held by an agency is an agency record *except* if Congress has manifestly made clear it maintains control. If "a document that could not reveal anything about agency decisionmaking is not an 'agency record,'" *Jud. Watch, Inc. v. Fed. Hous. Fin. Agency ("Judicial Watch I")*, 646 F.3d 924, 928 (D.C. Cir. 2011), then logic suggests the opposite is also true: a document that reveals agency decisionmaking is a prototypical agency record subject to FOIA. Nothing in the district court's holding nor Plaintiff's argument contradicts FOIA's purpose "as an Executive Branch transparency statute." App. Br. at 13. Congress itself remains under no statutory obligation to respond to FOIA requests. But Congress could have exempted from disclosure any congressionally created document that ended up in the possession of a federal agency subject to FOIA, and it did not. This Court should not allow the Committee to create an exemption to FOIA that Congress itself did not.

**A.** All Agency Records, Including the Records in This Case, Fulfill Two Requirements: the Agency Both Created or Obtained Them and Controlled Them.

FOIA requires agencies to produce to the public "agency records," 5 U.S.C. § 552(a)(4)(B), though the Act "never defines that crucial phrase," *McGehee v. C.I.A.*, 697 F.2d 1095, 1106 (D.C. Cir. 1983), *on reh'g*, 711 F.2d 1076 (D.C. Cir. 1983). The Supreme Court elucidated a two-part definition: they must be records "that an agency (1) creates or obtains, and (2) controls . . . at the time the FOIA request is made." *ACLU II*, 823 F.3d at 662 (quoting *Tax Analysts II,* 492 U.S. at 144–45). As "[t]he burden is on the [government] to demonstrate, not the requester to disprove, that the materials sought are not 'agency records . . . ,'" *Tax Analysts II*, 492 U.S. at 142 n.3, to remove records from FOIA's disclosure requirements the government must either prove that the agency neither created nor obtained the document, or that the agency did not control the document at the moment of the request. *See also United We Stand Am. v. I.R.S.*, 219 F. Supp. 2d 14, 16 (D.D.C. 2002), *aff'd in part and remanded*, 359 F.3d 595 (D.C. Cir. 2004). Here, the Committee, standing in the shoes of the government as the Intervenor-Defendant, bears this burden.

18

In this case, where it is undisputed that the Agencies created or obtained the Contested Records, JA840; JA864 ("[T]he first part of the test . . . is clearly satisfied and undisputed."), the parties contest only the "control" factor. The D.C. Circuit uses a four-factor test to determine the entity with control:

> (1) the intent of the document's creator to retain or relinquish control over the records;
> (2) the ability of the agency to use and dispose of the record as it sees fit;
> (3) the extent to which agency personnel have read or relied upon the document; and
> (4) the degree to which the document was integrated into the agency's record system or files.

*Burka*, 87 F.3d at 515 (quoting *Tax Analysts I,* 845 F.2d at 1069) (formatting modified). All four factors, as applied to the records at issue in this case, establish that these are agency, not congressional, records. *See* Sections I.C, II.B, III.B-C, *infra*. Thus, even if the Committee's novel single-factor test applies, it still fails to show the Contested Records are congressional.

**B.** This Circuit's Precedent Establishes Multiple Considerations That Are Relevant to Manifesting Clear Intent to Control.

In no case has the D.C. Circuit's review of the first *Burka* factor ever stopped at any mere indicia of Congress's intent. A review of this

Circuit's congressional records precedent reveals multiple factors that the Court has reviewed to determine whether congressional intent to control was clearly manifested to the agencies. The key indicators that emerge include the context in which the records were created; the timing of the expression of intent; the scope; and the speaker's identity and authority.

- <u>Oversight Context</u>: Whether records are created in the context of congressional oversight is relevant to determining whether intent to control was expressed clearly enough.[2] Agencies know to expect requests from Congress to exchange documents as part of its "exercise[] [of] oversight authority over the various federal agencies . . . to facilitate their proper functioning [. . .]." *Goland*, 607 F.2d at 346. Records related to investigations and oversight are not necessarily protected congressional records—Committees often publish the results of their investigations, for example. *See Holy Spirit*, 636 F.2d at 841 (noting that the subcommittee claiming control over records "published a 1200-page report on the

---

[2] Whether a record was created in the oversight context is also relevant to determining which test applies: the full four-factor *Burka* test or the modified two-factor test. *See* Section III.A, *infra*.

investigation.") But it is more likely that, in the oversight context, an agency may "obtain[]" records "from or prepare[]" records "in response to a request from . . . Congress" that would not exist or be in the agency's custody but for Congress's oversight inquiry. *ACLU II*, 823 F.3d at 662 (quoting *Jud. Watch, Inc. v. U.S. Secret Serv. ("Judicial Watch II")*, 726 F.3d 208, 221 (D.C. Cir. 2011)). Congress's intent to control such records is thus more likely to be clearly expressed to and understood by the agency.

- Advance or Contemporaneous Intent: Timing matters, as "Congress may manifest an intent to retain control over documents *either* when the documents are created *or* when the documents are transmitted to an agency." *ACLU II*, 823 F.3d at 664. "[P]ost-hoc objections to disclosure cannot manifest the clear assertion of congressional control that [the D.C. Circuit] case law requires." *United We Stand*, 359 F.3d at 602. While the expressed intent does not have to be "contemporaneous," intent to control expressed *after* the creation or transfer of documents to the agency is not sufficient evidence. *Holy Spirit*, 636 at 842; *see also Paisley*, 712 F.2d at 695 ("*post-hoc* rationalization" does not establish congressional control).

21

- <u>Specific and Defined Scope of Records</u>: Any intent to control must include instructions that are "specific" as to the "particular documents." *Paisley*, 712 F.2d at 694. Agencies must be able "to evaluate and limit the breadth" of any instructions regarding congressional intent to control, which can be determined by identifying "particular documents or . . . particular criteria" applying to an identifiable set of records. *Id.* at 695. This can be a particular record marked "Secret," *Goland*, 607 F.2d at 347; a set of specific records "not already publicly accessible on the internet," *Cause of Action v. Nat'l Archives & Recs. Admin.*, 753 F.3d 210, 213 (D.C. Cir. 2014); or as broad as any record "emanating from" a specified oversight investigation, *ACLU II*, 823 F.3d at 666. But regardless of the breadth of records the congressional intent reaches, the instructions must be "precise" rather than "general and sweeping." *Id.*

- <u>Formal Communication from a Senior Speaker</u>: The speaker's position and formality of the communication are relevant factors in expressing an intent to maintain control over records. Seniority of the speaker (e.g., a Committee Chairman) is evidence of authority

to speak for the Legislative Branch and bind a co-equal branch of government. In *ACLU II*, the "critical evidence" that the Senate Intelligence Committee intended to maintain control over the Torture Report was a "Letter from the Senate Committee Chairman and Vice Chairman . . . mak[ing] it plain that the Senate Committee intended to control any and all of [the] work product . . . emanating from its oversight investigation of the CIA." 823 F.3d at 664–65. And in *United We Stand*, the court "emphasize[d] that . . . the confidentiality directive appears in a letter written by the Joint Committee's chief of staff as part of an investigation authorized by the chairman, vice-chairman, and ranking members of the Joint Committee [. . . ]." 359 F.3d at 605. Intent may also be expressed by a Committee meeting in "executive session." *Goland*, 607 F.2d at 347–48. In all cases, intent has been expressed formally through either a written letter, *see*, *e.g.*, *Cause of Action*, 753 F.3d at 213 (Committee Chairman wrote to the Archivist of the United States), or marking a record "Secret," *Goland*, 607 F.2d at 347 (hearing transcript contemporaneously marked "secret").

As these cases show, there has never been an "easily administrable bright-line rule," App. Br. at 11, in this Circuit to determine whether Congress clearly manifested intent to control. But the cases also show that courts are well-equipped to make relevant factual assessments, as the district court did here. Specifically, the district court properly reviewed whether there was an oversight investigation, the identity of the individual purporting to speak for Congress, the form of the assertion of control—analysis Appellants wrongly claim was error, *id.*—in line with D.C. Circuit precedent.

**C.** The Appended Language Does Not Sufficiently Manifest the Committee's Intent to Control the Contested Records Under Even the Committee's Proposed One-Factor Test.

Based on both the text of the template legend itself and the context in which it was appended, the Committee did not manifest intent to control the Contested Records. It was not only appropriate for the district court to "peer[] behind the legend's text," App. Br. at 2, but necessary, as precedent requires the court to look at "all the facts," *Goland*, 607 F.2d at 347. And in looking at those facts, the district court correctly concluded that "the circumstances here do not show that Congress manifested its intent to control the records" because the "non-specific assertion does not

24

reflect the considered judgment that has previously been held to manifest Congress's clear intent." JA871.

As a threshold matter, the district court was right to assess the context of these records—not just the legend—finding the fact that "the Committee here did not engage in a formal oversight investigation of the Agencies" relevant to the question of intent to control. JA874. Beyond that context, the Committee's purported intent to control has numerous fatal deficiencies: there is inadequate evidence that the staffers who applied the legend were vested with authority sufficient to manifest intent regarding the Contested Records; the appended legend could not apply to emails created before its insertion; and the boilerplate legend did not reflect the necessary specificity to manifest intent.

> **1.** The fact that the Committee was not engaging in oversight over the Agencies is relevant to the clarity of its expression of intent.

As the district court correctly pointed out, the Contested Records here are distinct from those in all other congressional records cases, which "were in the context of Congress conducting oversight through hearings or other investigations." JA873. In those cases, "the *Committee* set parameters for the information exchanged with the Agencies." *Id.*

(emphasis in original). The Committee here argues that there is no "bright-line distinction between 'oversight' communications and 'legislative' communications," App. Br. at 33, but there is a "fundamental distinction between constitutionally authorized oversight and other congressional requests for information." Auth. of Ind. Members of Congress to Conduct Oversight of the Executive Branch, 41 Op. O.L.C. 76, 78 (2017), *available at* https://www.justice.gov/olc/file/966326/download. It is only in the oversight context that there is an "implicit constitutional mandate to seek optimal accommodation . . . of the needs of the conflicting branches in the particular fact situation." *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Put otherwise, the Executive Branch is on notice that it has constitutional duties to respond to congressional oversight requests, which are "legally enforceable through a subpoena or contempt proceedings," but does not have the same constitutional obligation as to other requests or communications. *Id.* Whether or not a communication occurred in the oversight context is therefore relevant to evaluating the sufficiency of the Committee's stated intent to control the Contested

Records. And because there was no formal oversight investigation here, the Committee is not entitled to particular deference on that question.

### 2. A Committee staffer's unilateral conduct is insufficient to demonstrate Congress's intent.

The record here does not establish that Committee staffers had authority to express Congress's intent to control the Contested Records. JA837–43. This Court has emphasized the status of the speaker, usually the Committee Chairman (or, on occasion, a Chief of Staff authorized to act on the Chairman's behalf), in finding sufficient intent to control specific records. This is logical, as the individual or group manifesting intent must have the authority to speak for Congress and therefore to bind a co-equal branch of government. But here, as the district court correctly concluded, the Committee has "fall[en] far short" of proving that the staffer-appended footer demonstrated "that the *Committee* made a specific determination that these communications should be subject to congressional control." JA879 (emphasis added).

The Committee argues that the speaker is irrelevant, as Congress can delegate authority as it wishes. App. Br. at 39. Neither AO nor the District Court disagrees that Congress *could*, under certain circumstances, delegate clear authority to a staffer to convey the message

on behalf of a congressional committee that it intends to retain control over records. JA877–78 ("[T]he Court does not need to categorically decide that non-leadership staff can *never* manifest Congress's intent, but . . . the facts of how such an assertion occur are relevant to whether such a manifestation clearly occurred." (emphasis in original)). But the speaker must be clearly authorized, as to the specific records in question, to speak on behalf of Congress, because they are asking the Executive Branch to substitute Congress's determination as to the records for its own. *See* Section IV, *infra* (discussing the separation of powers). The Committee simply has not shown that authority was delegated properly to the staffers as to the Contested Records specifically, and its position cannot be squared with precedent.

In every case addressing this question, only a high-level official, and almost always an elected official, was found to have the authority to speak for the Committee or Congress as a whole. In *ACLU II*, it was "critical evidence" that Senate Committee Chairman and Vice Chairman sent a letter "mak[ing] it plain that the Senate Committee intended to control any and all of [the] work product . . . emanating from its oversight investigation of the CIA." 823 F.3d at 664–65. In *United We Stand,* the

"chairman, vice-chairman, and ranking members of the Joint Committee" on Taxation asked the Internal Revenue Service to investigate a matter, and the Joint Committee's chief of staff stated that the request for information was part of the committee's investigation and, thus, a congressional record. 359 F.3d at 597; *see also Ctr. for Nat. Sec. Stud. v. C.I.A.*, 577 F. Supp. 584, 585 (D.D.C. 1983) (intent asserted by chairman of House Select Committee on Intelligence); *Goland*, 607 F.2d at 347–48 (committee oversight hearing was held in executive session, the transcript was contemporaneously marked secret, and provided to the CIA with contemporaneous direction that it could only be used for limited purposes). Even a committee chairman's assertion of intent to control is not always sufficient. *See Paisley*, 712 F.2d at 695 n.38 (holding a letter from the Chairman of the Senate Select Committee on Intelligence that "explicitly spell[ed] out the Committee's desire" that the records be considered congressional was too "general and sweeping" to constitute clear intent to control).

Despite this precedent, the Committee argues that the district court was wrong to assess the staffers' authority here, claiming "it is not for the courts to second guess" whether authorization occurred or was

29

sufficient. App. Br. at 38–39. But there is no support in precedent for a finding of congressional intent to control based on this fact pattern: a staffer with only generalized authorization who has appended a non-specific template footer "when deemed appropriate," with no further instruction. JA752 ¶10. Under the Committee's proposed test, it would be utterly irrelevant whether, as the district court explained, that authorization was general or specific, "the scope of the authorization to use the Legend, whether all staffers or only certain staffers had such authority, whether staffers were provided any guidance on when to assert the authority, and whether the staffer's invocation of the authority was subject to any review." JA879.

The defect is not the staffer's position in the hierarchy but the lack of evidence that the Committee as a whole authorized the staffer to speak for the Committee as to these specific records. To be sure, aides may be the equivalent of members' "alter egos," *Gravel v. United States*, 408 U.S. 606, 617 (1972), but individual members are not delegated the same authority as Committees to act on behalf of Congress. *See Watkins v. United States*, 354 U.S. 178, 201 (1957) ("[C]ommittees and subcommittees, sometimes one Congressman [the Chair], are endowed

with the full power of the Congress to compel testimony."); *see also Exxon Corp. v. F.T.C.*, 589 F.2d 582, 593 (D.C. Cir. 1978) ("committees or subcommittees, not . . . individual members," have the authority to act on behalf of Congress to compel production of evidence). The Executive Branch is well aware of this fact: DOJ's Office of Legal Counsel has noted that individual Members, "including ranking minority members, generally do not act on behalf of congressional committees." Auth. of Ind. Members of Congress to Conduct Oversight of the Executive Branch, 41 Op. O.L.C. at 77 (quoting Application of Privacy Act, 25 Op. O.L.C. 279 (2001)). Therefore, agency personnel would not expect an individual Member—let alone a staffer—to be speaking on behalf of the Legislative Branch, without clear evidence of specific authorization by the committee, subcommittee, or chair.

D.C. Circuit precedent elucidates the level of specific authorization that must be shown. In *United We Stand*, the "confidentiality directive" was written by the Committee's Chief of Staff as part of an investigation "authorized by the chairman, vice-chairman, and ranking members [. . .]." 359 F.3d at 605. There is no question that committee leadership knew of and had authorized the investigation—in fact, they had directed

committee staff to investigate the IRS, and the chief of staff's letter was sent as part of the investigation. *See id.* at 597. Similarly, in *Goland*, the document in question (a hearing transcript) was created and marked "Secret" by a stenographer and typist sworn to secrecy by the Chairman of the Committee. 607 F.2d at 347. In both cases, any authority to speak for the Committee was not only granted directly by the chair of the Committee but as to a specific document or investigation. There is no support in this Court's precedent for the Committee's position that an individual staffer can unilaterally declare congressional control over an endless number of documents based on a general and limitless grant of authority to remove documents from public disclosure whenever that staffer deems it appropriate. Instead, pursuant to relevant precedent, Executive Branch agencies would not, and indeed did not here, view themselves as bound to the conditions put forth by an individual staffer without substantiation that it was specifically authorized by the Committee or its chair.

**3.** The Committee cannot demonstrate intent to control messages that precede emails containing the legend.

The Committee did not timely express intent to control any of the Contested Records that preceded the appended legend, because

retroactive assertions of congressional control are not valid. Of the Contested Records, fifteen emails and one attachment precede any appearance of the legend. JA755–815; JA817 ¶ 2. *See also* App. Br. at 26 ("[N]ot every individual email message and attachment within the Legended Documents includes the Legend.") Even if the legend sufficiently expressed intent to control emails exchanged after it was added (it did not), it certainly cannot apply to these preexisting records. Furthermore, the Committee cannot arbitrarily sweep in non-legended emails simply because they were later produced as part of a chain.

a. *The Committee's post-hoc statements of intent are invalid.*

"[P]ost-hoc objections to disclosure cannot manifest the clear assertion of congressional control that [D.C. Circuit] case law requires." *United We Stand*, 359 F.3d at 602; *see also* Section I.B, *supra.* Congress must assert control prior to or contemporaneously with the creation or transfer of the documents. *See ACLU II*, 823 F.3d at 664.[3] This is logical,

---

[3] In all cases where the D.C. Circuit has found records in an agency's possession to be congressional records, Congress's intent to control was expressed before or at the time of the document's creation. *See Goland*, 607 F.2d at 347–48 (hearing transcript marked "Secret" when made available to agency); *Paisley*, 712 F.2d at 694 (records were "properly held

because the agency can freely utilize the documents if Congress has not indicated that it intends to maintain control.[4] *See ACLU II*, 823 F.3d at 664.

The Committee again misreads *ACLU II* in arguing that manifestation of intent need not be "contemporaneous." App. Br. at 18, 29. In *ACLU II*, the D.C. Circuit held that a contemporaneous manifestation of intent was not required when Congress had already manifested intent to control the records *before* their creation. 823 F.3d at 667 (holding congressional assertion of intent to control records five years prior to transmittal of documents was sufficient). Nothing in precedent nor logic supports the Committee's position that manifestation of intent can apply backwards in time. Once a document has been created or

---

by the District Court to be exempt congressional documents in light of their [contemporaneous] classification markings"), *United We Stand*, 359 F.3d at 597, 600–01 (oversight letter facially manifested Congress's intent to retain control); *ACLU II*, 823 F.3d at 659–60, 667–68 (letter prepared before oversight investigation sufficiently demonstrated congressional intent to control records created during investigation).

[4] This is especially true where, as here, the records are created as part of an active, back-and-forth exchange between two co-equal branches of government, about a topic on which each had an independent interest and used the records as part of their independent duties.

transmitted without any indication that it belongs to the Committee, it becomes part of the agency's records and under its full control.

The Committee's position is especially ludicrous as to the OMB Contested Record, a communication initiated by an OMB employee—not the Committee—seeking assistance with a "policy issue," followed by policy discussion and negotiation responding to this initial agency request. *See* JA841 ¶ 15; *see also* JA755–56. Only with the fourth message was the Committee's footer introduced to the chain. *Id.* Similarly, each of the four HHS email chains at issue began with a series of three messages (one of which included an attachment), with the footer introduced into the chain in the fourth message. *See* JA798–815; JA817 ¶ 2.[5] The Agencies had no reason to believe, at the time of the creation or transmittal of these documents, that Congress intended to control them. The Agencies therefore would have had no reason to handle or use these documents any differently than any normal communication. Accepting the Committee's argument that belated expressions of intent apply to

---

[5] To the extent the same is true for the newly discovered HHS record, JA816–17 ¶ 1, this same point applies.

already-created documents would require federal agencies to become fortune tellers and mind readers.

> b. *The records must be analyzed as individual emails, not chain-by-chain, because intent must be specific to each document.*

To try to get around this temporal issue, the Committee argues that the Contested Records must be reviewed as entire email chains, rather than individual documents. This position falls apart under the slightest scrutiny. If the agency isolated the pre-legend email messages as separate files—as they no doubt have the technical capability to do—they would be obligated to produce them under FOIA. Or, if AO had only requested communications up to the time just before the legend was inserted in an email chain, the non-legended records would have been identified and produced separately.

The Committee inaccurately claims that "the Agencies processed each email chain entirely as a single record when producing them pursuant to FOIA," App. Br. at 26 (citing JA075, JA198–99), but the Contested Records were actually produced as part of large, thousand-plus page PDF files. JA823–24. By the Committee's logic, the footer,

appearing on a mere handful of emails, should cover every record within those PDF files—but even the Committee does not go so far.

Moreover, Congress must manifest a clear intent to control the particular record at issue, not just make a generalized assertion of confidentiality. *See, e.g.*, *Paisley*, 712 F.2d at 694 (finding "no *contemporaneous* and *specific* instructions from [the Committee] to the agencies limiting either the use or disclosure of the documents" and requiring "sufficient evidence of Congress' intent to retain control over *these particular documents*" (emphases in original)).[6] Only the portions of the record over which Congress clearly manifested a specific intent to control are outside the reach of FOIA. *See United We Stand*, 359 F.3d at

---

[6] Under FOIA case law, the determination of whether to treat an email chain as one or more records in FOIA processing turns on context-specific factors, including "the requester's intent, maintaining the integrity of the released documents, . . . and maintaining the public's trust in transparency." *Shapiro v. C.I.A.*, 247 F. Supp. 3d 53, 74–75 (D.D.C. 2017) (citing *OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update*, U.S. Dep't of Justice (updated 1995), https://www.justice.gov/oip/blog/foia-update-oip-guidance-determining-scope-foia-request); *see also Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev. ("AILA")*, 830 F.3d 667, 678 (D.C. Cir. 2016). But the standards employed in congressional records cases control here, not general FOIA cases. Even still, the Committee's reliance on *AILA*, a FOIA case, in its attempt to remove broad swathes of records from public disclosure, App. Br. at 26–27 (citing 830 F.3d at 678–79), is notable given FOIA's emphasis on disclosure.

602 ("[T]he Joint Committee's directive and expectation of confidentiality extend only to its April 28 request and to those portions of the IRS response that would effectively disclose that request."). The Committee's attempt to broaden the reach of its legend (even if it was sufficient to manifest intent, which it is not, *see* Section I.C.4, *infra*), runs afoul of the D.C. Circuit's express concern that an overbroad view of congressional records would "exempt from FOIA's purview a broad array of materials otherwise clearly categorizable as agency records, thereby undermining the spirit of broad disclosure that animates the Act." *Paisley*, 712 F.2d at 696. The Committee cannot rely on retroactive intent or extend the definition of a document to sweep in records that the Agencies had no reason to believe Congress controlled.

    **4.**    The legend itself is not adequate nor sufficiently specific to manifest congressional intent to control the remaining Contested Records.

The broad and generic legend fails to manifest congressional intent as to the remaining records. Far from the "gold standard" the Committee professes this language to be, App. Br. at 23, it is exactly the type of "general and sweeping" statement that cannot "provide sufficient proof, when standing alone, of a specific intent to transfer" the Contested

Records to the Agencies "for a 'limited purpose and on condition of secrecy,'" *Paisley*, 712 F.2d at 695 (quoting *Goland*, 607 F.2d at 348 n.48).

The footer expresses an intent to control records almost without limit, extending to "[t]his document and any related documents," as well as "any response to this Committee document or any related Committee communications." JA755–815. The language offers no guidance on how the agency should identify "related documents." *See id.* "This matter" is undefined, rendering the professed intent to control at best murky and at worst boundless. Moreover, the footer language is internally contradictory, first referring only to documents generated by members or staff of the Committee and later saying "[a]ny such documents"—i.e., referring to Committee-created documents—"created or compiled *by an agency* . . . are also records of the Committee." JA756 (emphasis added). The language is entirely ambiguous, and the recipient agency is once again being asked to read minds.

It is not "difficult to imagine how [the template language] could have been clearer," App. Br. at 11, because it stands in sharp contrast to the "clear [and] precise" delineation of the limits of congressional intent to control seen in other congressional records cases, *see ACLU II*, 823

F.3d at 666. In *ACLU II*, the committee limited its claim of control to "work produced during its investigation of the CIA's former detention and interrogation program." *Id.* In *United We Stand*, this Circuit held that the joint committee's intent to control was limited to a specific document and the portions of the agency's response that would reveal the contents of that document. 359 F.3d at 602. The Committee' reliance on *United We Stand*, App. Br. at 25, is misplaced, because its template footer language here does not meet the standards set by the Joint Committee's "specific showing of congressional intent to control documents. . . ." 359 F.3d at 602 (citing *Paisley*, 712 F.3d at 695). The Joint Committee's intent to control in that case was limited to "this document," *id.*, which could not be more specific, as opposed to the ambiguous "this matter" at issue here. Additionally, the Joint Committee's letter contained a clear direction that the document at issue "may not be disclosed without the prior approval of the Joint Committee." *Id.* Here, the footer only vaguely states that the records "are entrusted to your agency only for use in handling this matter." JA756.[7] The footer reflects neither the "limited purpose" for the

---

[7] Again, "this matter" is undefined. If the agency interpreted it as broadly as, for instance, any health care-related matter, the agency could

document's use nor the clear "condition of secrecy" that precedent in this Circuit requires. *Goland*, 607 F.2d at 348 n.48.

The "non-specific assertion" contained in the footer "does not reflect the considered judgment that has previously been held to manifest Congress's clear intent." JA871. Instead, the footer "was drafted to be wide-reaching and encompass a broad number of records that could be related to the exchange to which the Legend is inserted." JA880. There is no evidence that there was particularized judgment by the Committee to assert control over the Contested Records specifically. Rather, apparently to cover as many bases as possible, the language is muddy and ambiguous. The Committee did not meet its basic requirement of manifesting intent: ensuring that the recipient agency could clearly understand the universe of documents over which Congress wanted to maintain control.

---

presumably disclose the communication to a non-governmental health care policy expert without running afoul of the Committee's conditions.

## II. THE AGENCY'S ACTIONS HERE SHOW THAT CONGRESSIONAL MANIFESTATION OF INTENT WAS NOT EXPRESSED CLEARLY.

Under this Court's precedent, the control inquiry is not limited to just the first *Burka* factor—congressional intent to control. At a minimum, the second *Burka* factor—agency ability to use and dispose of records—applies.[8] *ACLU II*, 823 F.3d at 662–63. Here, the second *Burka* factor demonstrates the Agencies did not understand themselves to be bound by any purported congressional intent to control the Contested Records and used them accordingly. The district court did not err in determining that under at least the first two factors of the standard test for congressional control, the Contested Records were agency, not congressional, and this Court should not overturn that decision and break with its own longstanding precedent.

---

[8] This modified two-factor test is applicable only in the context of congressional oversight. *See* Section III.A, *infra.* No oversight function is implicated here, and so the full four-factor test applies, but AO nevertheless prevails even under the two-factor modified test. *See* JA869 ("American Oversight and the Agencies prevail under either test.").

**A.** Under Any Test, the Inquiry Must Go Beyond Congressional Expression of Intent to Control to Examine Whether the Agency Understood Itself to be Bound.

Ignoring decades of clear instruction from the D.C. Circuit, the Committee proposes a new "easily administrable bright-line rule" that looks solely to "whether Congress manifested its intent to control the document." App. Br. at 11; *see also* JA868 ("[T]he Committee asks the Court to modify the test even further to view only the first factor as relevant and dispositive. . . ."). This flatly contradicts the *Goland* court's directive that the court must consider "all the facts of the case" to determine whether a "document has passed from the control of Congress and become property subject to the free disposition of the agency." *Goland*, 607 F.2d at 347;[9] *see also United We Stand*, 219 F. Supp. 2d at 16 ("To determine control, the Court must undertake a fact-based inquiry

---

[9] The Congressional Research Service, which operates "at the behest of and under the direction of Congress" and provides information to Members, Cong. Research Serv., *CRS Products from the Library of Congress*, https://www.congress.gov/crs-products (last accessed May 8, 2026), has acknowledged that the intent to control assessment requires inquiry into multiple factors—not administration of a "bright-line rule," Benjamin M. Barczewski, Cong. Research Serv., The Freedom of Information Act (FOIA): A Legal Overview (June 27, 2024), https://www.congress.gov/crs-product/R46238#ifn488 ("Whether Congress has sufficiently manifested intent to control a document ultimately depends on the circumstances underlying each case.")

to discern, based upon the totality of the circumstances, who intended to control the records in question.").

And "all the facts" include the agency's understanding—in other words, the D.C. Circuit established that the modified test requires the Court to look at "the first *two* factors" of the standard test. *Judicial Watch II*, 726 F.3d at 221 (emphasis added);[10] *see also Cause of Action*, 753 F.3d at 214; *ACLU II*, 823 F.3d at 663. Precedent from *Goland* to *ACLU II* created, at minimum, a two-factor test that looks both to whether intent was expressed and whether that intent was expressed clearly enough to the receiving agency to understand that the record was at all times under congressional control. A court must therefore analyze the agency's actions—its "ability . . . to use and dispose of the record as it sees fit," *ACLU II*, 823 F.3d at 662—to assess whether any manifestation of control was *clear*. As the Committee admits, "a Congressional entity" could be "vague in manifesting its intent," which would make the second factor "relevant." App. Br. at 43, n.17; *see also* Section I.C.4, *supra*. But

---

[10] Notably, the Committee relies extensively on *Judicial Watch II,* 726 F.3d at 208–234, in its brief, but omits the statement that analysis of manifestation of congressional intent to control "renders the first *two* factors of the standard test effectively dispositive," *id.* at 218 (emphasis added). *See generally* App. Br.

even when a court recognizes indicia of manifestation of intent (whether vague or not), the second factor—agency use of the records "in any operational way"—remains a key part of the analysis. *Cause of Action*, 753 F.3d at 216. If the agency is able to use and dispose of the records, then those records should be deemed agency records, as they are relevant to "FOIA's key objective" of "revealing to the public how federal agencies operate." *Id.* at 215. On the other hand, if the agency merely holds the records as a "repository" for another governmental entity, *cf. id.* at 213–16, then revealing the records would not play so critical a role in furthering FOIA's purpose.

The Committee breaks from settled law in arguing that the two *Burka* factors "effectively merge into one when Congress clearly manifests its intent to control a document." App. Br. at 16. Moreover, its logic is circular. The second factor is *always* independently relevant to determining whether intent is *clear*. As in statutory construction, words in a case holding have consequential meaning. *Cf. Great Lakes Comnet, Inc. v. Fed. Commc'ns Comm'n*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[W]hen construing a statute courts 'give effect, if possible, to every clause and word.'")). The

Committee's proposed test would read out the word "clear," to effectively turn the test into "whether Congress manifested . . . [any] intent to control the document." *Judicial Watch II*, 726 F.3d at 221. This would affect a significant shift in favor of congressional control, contradicting decades of precedent setting forth a balanced review process looking at "all the facts." *Goland*, 607 F.2d at 347.

**B.** The Agencies' Ability to Use and Dispose of the Records Demonstrates that Any Congressional Manifestation of Intent Was Insufficiently Clear.

The most obvious demonstration that any congressional manifestation of intent to control the Contested Records lacked clarity is the fact that the agencies considered themselves free to, and in fact did, use and dispose of the records as they saw fit. *Burka*, 87 F.3d at 515; *see also* JA883 ("[H]ow the Agencies used the documents may be indicative of whether Congress manifested a clear intent to control them."). The record is unambiguous: both HHS and OMB used the Contested Records, including those containing the Committee's template footer, for their own purposes, including for advising the President. JA841 ¶ 14; JA843 ¶ 29. The communications were an exchange of information about "specific health care proposals" to be used in "crafting Executive Branch

legislative strategy and ultimately advising the President on whether he should sign or veto the bill." JA075; *see also* JA198–99. They did not hold the records as a "trustee" for Congress or "solely for internal reference purposes," *Goland*, 607 F.2d at 347, but used them for Agency-specific goals.

One Agency here affirmatively sought information from the Committee, JA756, in contrast to the congressional records cases where Congress asked agencies for information to further its own agenda. *See ACLU II*, 823 F.3d at 658 (seeking information from the CIA regarding its detention and interrogation program); *United We Stand*, 359 F.3d at 597 ("requesting specified categories of documents and information" from IRS). The Agencies did not "agree[] to the terms of the Legend while exchanging emails with the committee staffers," JA883, unlike in *ACLU II* where there were formal negotiations between a congressional committee and agency to reach an agreement "regarding the Committee's control over its work product," 823 F.3d at 658.

The Committee does not dispute that the Agencies actually used the records, and in fact admits it "afford[ed] the Agencies discretion to use the documents for handling health care reform discussions. . . ." App.

Br. 11. The Committee argues it did not thereby "surrender[] exclusive control over" the Contested Records, *id.*, but the onus is on the Committee to retain exclusive control for the documents to maintain their congressional status. If the agency has discretion to use those documents for its own decisionmaking and other purposes, then those records are exactly the type FOIA exists to make public. *See Reps. Comm.,* 489 U.S. at 772 (noting that FOIA "was designed to create a broad right of access to official information" (internal quotes omitted)). Indeed, the Agencies understand themselves to be statutorily bound to produce the Contested Records as their own documents subject to their control in response to a FOIA request. The production of the records under FOIA manifests the Agencies' clear understanding that they were in control over the records.

## III. WHEN, AS HERE, CONGRESS'S OVERSIGHT FUNCTION IS NOT IMPLICATED, THE FULL FOUR-FACTOR *BURKA* TEST APPLIES AND WEIGHS IN FAVOR OF AGENCY CONTROL.

The modified two-factor test is applicable only when Congress's constitutional oversight powers are implicated. As that is not the case here, analysis of *Burka* factors three and four—the Agencies' reliance on the Contested Records and their integration into Agency systems—is

relevant and necessary to determine whether the records are agency or congressional. Both factors weigh in favor of the Agencies.

A. No Special Policy Considerations That Would Trigger the Modified Two-Factor Test Are Relevant Here, as the Contested Records Do Not Relate to Oversight Activities.

Courts may only ignore factors three and four of the standard *Burka* test when "special policy considerations . . . counsel in favor of according due deference to Congress' affirmatively expressed intent to control its only documents." *ACLU II*, 823 F.3d at 662 (quoting *Judicial Watch II*, 726 F.3d at 221). Limiting the standard *Burka* test by eliminating two factors that look solely at agency treatment of the records weights the scale in favor of Congress's expressed intent, but that counterbalance is only triggered when "safeguard[ing] Congress' . . . vital function as overseer of the Executive Branch." *Paisley*, 712 F.2d at 693 n.30. There is no such oversight trigger here.

This limited test "arise[s] from a series of decisions issued by this court, beginning with *Goland v. CIA*." *ACLU II*, 823 F.3d at 663. The court in *Goland* relied on the "circumstances attending the document's generation and the conditions attached to its possession" to determine that Congress had not intended to relinquish control over the records.

607 F.2d at 347. The Court was careful to protect Congress's ability to "exercise[] oversight authority over the various federal agencies" by "exchanging documents" without surrendering "secrecy" or "impair[ing] . . . its oversight role." *Id.* at 346.

Later cases examined whether Congress had "clearly expressed an intent to retain control" over records. *ACLU II*, 823 F.3d at 663 (quoting *Judicial Watch II*, 726 F.3d at 221). The D.C. Circuit regularly found congressional indicia of control to be lacking and thus records to be agency records. *See, e.g. Holy Spirit*, 636 F.2d at 842; *Ryan v. Dep't of Just.*, 617 F.2d 781, 786 (D.C. Cir. 1980); *Paisley*, 712 F.2d at 694. "The culmination of this line" of cases, *Judicial Watch II*, 726 F.3d at 222, was *United We Stand America, Inc. v. I.R.S.*—the first "applica[tion] of the four-factor [*Burka*] analysis in the congressional context." 359 F.3d at 599. The D.C. Circuit concluded that the *Goland* standard implicated only the first two *Burka* factors, which, taken together, demonstrate "whether Congress manifested a clear intent to control the document." *Id.* at 597. Later D.C. Circuit cases analyzing congressional control in the oversight context have followed *United We Stand*'s modified two-factor

test. *Judicial Watch II*, 726 F.3d at 221; *see also Cause of Action*, 753 F.3d

at 214–15; *ACLU II*, 823 F.3d at 663.

The foundations and evolution of the case law show that the

deference underpinning the modified two-factor test is applicable only

when the records relate to Congress's constitutional oversight role, as in

that context, "special policy considerations . . . counsel in favor of

according due deference to Congress' affirmatively expressed intent to

control its own documents." *ACLU II*, 823 F.3d at 662 (quoting *Judicial*

*Watch II*, 726 F.3d at 221).[11] These "special policy considerations [that]

---

[11] As the district court explained:

> The D.C. Circuit cases that developed the modified test and
> considered whether records were "agency" or "congressional"
> for FOIA purposes were in the context of Congress conducting
> oversight through hearings or other investigations. *See*
> *Goland*, 607 F.2d at 343 ("stenographic transcript of Hearings
> held before the House Committee on Expenditures in the
> Executive Departments"); *Holy Spirit*, 636 F.2d at 840–41
> (correspondence and memoranda generated by one of four
> committees that was investigating Korean-American
> relations from 1976–1978); *Paisley*, 712 F.2d at 689–90
> (Senate Select Committee on Intelligence investigation into
> the death of former CIA agent John A. Paisley); *United We*
> *Stand*, 359 F.3d at 597 (internal citations omitted) (Joint
> Committee on Taxation investigation into 'whether the IRS's
> selection of tax-exempt organizations . . . for audit has been
> politically motivated"); *ACLU [II]*, 823 F.3d at 659 (Senate
> Select Committee on Intelligence 'oversight review of the

militate against" classifying a record as an agency record exist "sometimes," but not always. *Cause of Action*, 753 F.3d at 215. But that deference exists to "safeguard Congress' . . . vital function as overseer of the Executive Branch," *Paisley*, 712 F.2d at 693 n.30, not to protect *all* documents related to congressional activities.[12] This is because Congress has "an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent," which is the basis of the oversight function. *Goland*, 607 F.2d at 346. The Court therefore felt it was necessary to give more deference to Congress's expressed intent to control where Congress's oversight duties necessarily required a free and open line of communication to federal agencies, in order to ensure smooth functioning across the branches.

---

> CIA's highly controversial, but then-defunct, detention and interrogation program").

JA873–74.

[12] The Committee argues that other Congressional responsibilities implicate "special policy considerations," App. Br. 20–21, but D.C. Circuit precedent is clear that these considerations arise in the *oversight* context. *See Goland*, 607 F.2d at 346 (deference is important lest Congress "suffer an impairment of its oversight role"); *Paisley*, 712 F.2d at 693 n.30 (deference exists to "safeguard Congress' . . . vital function as overseer of the Executive Branch"); *Ryan*, 617 F.2d at 785 (denying deference "would seriously impair Congress's oversight role").

The Contested Records involve precisely the sort of discussions the D.C. Circuit warned should not necessarily be shielded from disclosure under FOIA as congressional records:

> Many agencies . . . must work frequently and closely with congressional committees on matters of budget and policy or on individual cases. We decline to hold, in the absence of some stronger indicia of congressional intent, that all documents so generated in this or similar "joint" congressional and agency investigations constitute records within Congress' exclusive control.

*Paisley*, 712 F.2d at 696. On their face, these email chains do not relate to any formal, or even informal, Committee oversight investigation, but are instead quotidian back-and-forth policy discussions between individuals representing two co-equal branches of the federal government. As the unredacted portions of the records indicate, and the Agencies' record evidence underlines, the email chains reflect policy discussions regarding health insurance and health care reform. JA755–815; JA835–36 ¶¶ 34–37; *see also* JA882 ("The Agencies describe in detail how they sought and used the information from the Committee for their decision-making about the proposed health care reform legislation. . . .") Indeed, one of the emails was initiated by an agency employee,

underscoring that they were not limited to discussions of congressional activities. JA841 ¶ 15; JA756.

The modified test was never meant to apply to all records implicating congressional interests. *See Cause of Action*, 753 F.3d at 215 ("special policy considerations militat[ing] against" classifying a record as an agency record exist "sometimes," but not always). To allow the Committee to weight the scale in its favor when no special policy considerations here trigger deference to Congress over the Executive Branch would both contravene *Goland* and its progeny and improperly advantage one co-equal branch over another. Instead, for non-oversight records, a court must assess all four *Burka* factors, and here, factors three and four confirm the records are under agency control.

**B.** Agency Personnel Read and Relied on the Contested Records Extensively.

The Committee does not dispute that the Agencies were not only "aware of the[] content" of the Contested Records, *Holy Spirit*, 636 F.2d at 842, but relied on them for their own purposes, *Burka*, 87 F.3d at 515. Under the standard test, the third factor, "actual use," is "often 'the decisive factor' when determining whether a requested document is an

agency record." *Cause of Action Inst. v. Off. of Mgmt. & Budget*, 10 F.4th 849, 857 (D.C. Cir. 2021) (quoting *Judicial Watch I*, 646 F.3d at 927).

On their face, the Contested Records show that the Agencies used and relied on the information to further the Agencies' work. The OMB Contested Record begins with a request from the agency to the Committee for information about "a policy issue," and a Committee staffer sends three attachments to OMB for the express purposes of "fill[ing] the 'white space'" for the agency staffer. JA756. The entire purpose of the communication was to provide information to the agency for the agency to read and rely on in its own work. Similarly, the HHS Contested Records consist of a back-and-forth exchange of information between the Committee and HHS employees, who were clearly reading the information during the exchange and relying on that information for their replies. JA798–815. This information was used by the Agencies in preparation for crafting legislative strategy and advising the President. JA847–48 ¶¶ 34–37; JA071.

These are exactly the types of records courts in the D.C. Circuit have held to satisfy the third *Burka* factor. *See, e.g., Burka*, 87 F.3d at 515 (the agency "read and relied significantly on the information in

writing articles and developing agency policies"); *Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*, No. CV 13-0483 (ABJ), 2014 WL 12943216, at *5 (D.D.C. Mar. 25, 2014) (agency personnel read and relied on documents "[t]o ensure compliance with [an agency] program"). Indeed, it is difficult to imagine more substantive or high-stakes agency uses for the Contested Records, and this factor clearly weighs in favor of agency control.

**C.** The Contested Records Were Deeply Integrated into the Agencies' Records Systems.

Factor four also demonstrates agency control. Rather than holding these records as a "trustee" for Congress, *see Goland*, 607 F.2d at 347, the Agencies deeply integrated the Contested Records into their systems such that the records were discovered in a search of those email systems to identify records responsive to AO's FOIA request. JA119–21 ¶¶ 16–17, 19–20; JA058–60 ¶¶ 8–12. There is no evidence in the record that either HHS or OMB understood themselves to be required to segregate these records in any way.

The Agencies' understanding was logical, because the emails were exchanged in the normal course of business and came into the agency employee's email inboxes. *See Hyatt v. U.S. Pat. & Trademark Off.*, 346

F. Supp. 3d 141, 150 (D.D.C. 2018) ("[T]he majority of the emails in an employee's inbox are (or at least ought to be) agency records."). To be sure, emails could be congressional records, but if the Agencies understood those emails to be congressional records, they would have segregated them from normal correspondence. *See Wolfe v. Dep't of Health & Hum. Servs.*, 711 F.2d 1077, 1081 (D.C. Cir. 1983) (reasoning that the lack of integration into an agency's "records system suggests the absence of [the agency's] control").

HHS's recent discovery of another legended responsive document underscores how well-integrated the Contested Records are into the agencies' files. JA842 ¶ 23; JA816–17 ¶ 1. If the records had been kept separate, it would not have taken the agency years to identify this record as it would have been segregated and easily found grouped with other emails containing the same legend. The fact that these records were treated exactly as any other email correspondence demonstrates that the fourth *Burka* factor, 87 F.3d at 515, like the other three factors, weighs in favor of agency control over the Contested Records.

## IV. PRINCIPLES UNDERLYING THE SEPARATION OF POWERS DOCTRINE DEMONSTRATE WHY CLEAR AND SPECIFIC INTENT TO CONTROL IS REQUIRED TO REMOVE RECORDS FROM AGENCY CONTROL.

Accepting the Committee's argument and allowing Congress, down to and including any individual staffer, to unilaterally bind a co-equal branch of the federal government would set up an occasion for constitutional confrontation and runs counter to the central principles of separation of powers. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020) ("Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." (citing The Federalist No. 51, at 349 (J. Madison) (J. Cooke ed., 1961))). "'[O]ccasions for constitutional confrontation between the two branches' should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389–90 (2004) (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)). Yet that is exactly what the Committee asks this Court to do: to prohibit any "second-guessing of [its] internal congressional affairs," App. Br. at 45, even though the Committee's self-interested definition of its internal affairs dictates what the Executive Branch can do not only with documents it receives but records it creates.

58

"Due deference" to Congress does not require courts to turn a blind eye to the facts of a case. JA881. Absent the Agencies' agreement that the records are subject to congressional control, the Committee has no legally enforceable interest in control of the documents. And whether an agency understands itself bound to maintain congressional control over records in its possession can depend on how that intent is manifested, including the speaker. *See* Sections I.B–C, *supra.* Thus, where intent to control is *not* clearly manifested, the records are not the "congressional documents" Congress intended to exempt "from disclosure under FOIA." *Goland*, 607 F.2d at 348 n.48.

D.C. Circuit case law does not permit the Committee to append what is effectively a boilerplate (and ambiguous) contract of adhesion to its communications and dictate not only what the receiving agency (which did not consent to the conditions) does with those communications but also control what that agency is permitted to do with any agency-generated response to it. Just because Congress says a document is a congressional record does not make it so. *See Holy Spirit*, 636 F.2d at 840; *Paisley*, 712 F.2d at 695–96. A plausible hypothetical illustrates the problem: suppose information "related" to that contained in the emails

from Congress were included in an agency memorandum to the President proposing a statement of administration position or a veto message. *See, e.g.*, JA075 (describing one Contested Record as an "[e]xchange characterizing attached policy analysis . . . for use in crafting Executive Branch legislative strategy and ultimately *advising the President on whether he should sign or veto the bill*" (emphasis added)). If the legend's expansive language were given effect, that memo could be considered a congressional record subject to exclusive congressional control. The Court cannot sanction such an absurd result—and yet that is what the Committee asks it to do.

Moreover, the Committee's position would claim congressional control essentially without limit over internal Executive Branch records created by Executive Branch officials to use for Executive Branch purposes and functions. The cases upon which the Committee relies— *Goland*, *ACLU II*, and *United We Stand*—primarily relate to circumstances where congressional committees sought to maintain control over records generated by Congress for purposes of congressional oversight and provided to the Executive Branch for limited purposes and on condition of secrecy. *See supra* Section III.A. Here the Committee

proposes a far greater intrusion into the operations of a co-equal branch, attempting to assert control over a wide range of agency-generated documents used for Executive Branch purposes, with no clarity as to how far control of "related" documents extends. The Committee speculates that the district court's decision would "chill Congressional oversight and legislative collaboration with the Executive Branch," App. Br. at 48, but affirming that Congress must evince clear and specific intent to control particular records would provide exactly the "clarity" both branches need to operate. *Id.*

Giving effect to the Committee's unilateral assertion of a right to control such documents would be a radical result. As the district court correctly concluded, "respect for the separation of powers and the purpose of [FOIA] mandate [the] rejection" of the Committee's argument. JA881. Failure to examine the circumstances and award control to the Committee would make a mockery of the separation of powers and instead make Congress the supreme branch any time it claims, *ipse dixit*, control.[13] That is simply not the law.

---

[13] The Committee's assertion, App. Br. at 53–54, that the presumption of regularity and good faith helps it in some way here is misplaced. The

# CONCLUSION

For the foregoing reasons, the judgment of the district court should

be affirmed.


Date: May 11, 2026            Respectfully submitted,

*/s/ Emma Lewis*
Emma Lewis
Katherine M. Anthony
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 919-6303
emma.lewis@americanoversight.org
katherine.anthony@americanoversight.org


*Counsel for Plaintiff-Appellant*

---

Committee's motivation is simply not a factor in the analysis that applicable law requires. *See Burka,* 87 F.3d at 515; *see also supra* at Sections I–III.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.	This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,439 words, as determined by the word-count function of Word for Microsoft 365.

2.	This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Century Schoolbook.

*/s/ Emma Lewis*
Emma Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

*/s/ Emma Lewis*
Emma Lewis